# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SCRUM ALLIANCE, INC. | § | |
| | § | |
| | § | |
| v. | § | |
| | § | Civil Action No.  4:20-CV-00227 |
| SCRUM, INC., JEFF SUTHERLAND, JJ | § | Judge Mazzant |
| SUTHERLAND | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff Scrum Alliance, Inc.'s First Amended Application for Preliminary Injunction (Dkt. #19).  Having considered the motion, the relevant pleadings, and the arguments and evidence introduced at the July 1 hearing, the Court finds that Plaintiff's First Amended Application for Preliminary Injunction should be granted.

## BACKGROUND

### Factual Background[1]

While the parties' factual allegations are detailed, the Court only provides those most relevant to Plaintiff's application for a preliminary injunction.  This case is about two entities that teach the "Scrum framework" (Dkt. #15).  "Scrum" is a framework that "can be used to put agile values and principles into practice" (Dkt. #15).  By doing so, teams can allegedly "deliver products and services quickly and efficiently" (Dkt. #15).  Luckily for the Court and for readers, a thorough understanding of the principles behind "Scrum" is unnecessary.

---

[1] Howard Sublett, Plaintiff's Chief Product Owner, verified the factual assertions in Plaintiff's amended complaint (Dkt. #15 at p. 5 n.2; Dkt. #15, Exhibit 1).

Plaintiff is a nonprofit and was founded in 2001 (Dkt. #15).  Plaintiff uses certification programs as an avenue to teach and promote the Scrum framework (Dkt. #15 ⁋ 15).  Plaintiff has certified around one million practitioners worldwide (Dkt. #15 ⁋ 15).

Plaintiff developed several valuable, registered trademarks in conjunction with its certification programs (Dkt. #15 ⁋ 15).  Plaintiff's three core trademarks are: "Registration Number 3,738,535 for CERTIFIED SCRUMMASTER®, Registration No. 3,510,571 for CERTIFIED SCRUM TRAINER®, and Registration Number 3,545,767 for CERTIFIED SCRUM PRODUCT OWNER®" ("Plaintiff's Marks") (Dkt. #15 ⁋ 15).  Plaintiff's Marks have obtained incontestable status pursuant to 15 U.S.C. § 1065 (Dkt. #15 ⁋ 15).

In late 2019, Defendant Scrum, Inc. ("Defendant SI") announced a new Scrum-certification program (Dkt. #15 ⁋ 20).  Plaintiff alleges that Defendant SI's program is a copy of Plaintiff's programs—and even worse, Defendant SI purportedly uses names for both its program and its trainers that are virtually identical to Plaintiff's Marks (Dkt. #15 ⁋ 20).  As recounted by Plaintiff:

> Specifically, [Defendant] SI created a Licensed Scrum Master course (to compete with [Plaintiff's] Certified ScrumMaster® course), a Licensed Scrum Product Owner course (to compete with [Plaintiff's] Certified Scrum Product Owner® course), and a Licensed Scrum Trainer certification (to compete with [Plaintiff's] Certified Scrum Trainer® certification) that each consist of training and result in credentialing with no discernible difference to [Plaintiff's] offerings.

(Dkt. #15 ⁋ 22).  Plaintiff claims that Defendant SI's Allegedly Infringing Marks were chosen deliberately and willfully to both confuse consumers and to trade on the goodwill and value associated with Plaintiff's Marks (Dkt. #15 ⁋ 23).

For comparison's sake, the Court reproduces the marks, side by side.  Plaintiff's Marks are on the left, and Defendant SI's Allegedly Infringing Marks are on the right:

| CERTIFIED SCRUMMASTER | LICENSED SCRUM MASTER |
|---|---|
| CERTIFIED SCRUM TRAINER | LICENSED SCRUM TRAINER |
| CERTIFIED SCRUM PRODUCT OWNER | LICENSED SCRUM PRODUCT OWNER |

(Dkt. #19 at pp. 10–11).

Plaintiff alleges several violations of the Lanham Act against Defendant SI, including federal trademark infringement, service mark infringement, false affiliation, false advertising, and unfair competition (Dkt. #15 at pp. 10–11).  Plaintiff also asserts trademark infringement and unfair competition under Texas law against Defendant SI, along with a breach-of-contract claim against Defendants Jeff and JJ Sutherland in their individual capacities (Dkt. #15 at p. 12).

Plaintiff requests preliminary and permanent injunctions on the basis of its trademark- and service-mark infringement claims (Dkt. #15 ¶ 4).

**Procedural History**

Plaintiff filed suit on March 18, 2020 (Dkt. #1).  The same day, Plaintiff filed its Motion for Preliminary Injunction (Dkt. #2).  On April 24, 2020, Plaintiff filed its amended complaint (Dkt. #15).  Plaintiff filed its First Amended Application for Preliminary Injunction a little over a month later on May 29 (Dkt. #19).  On June 17, 2020, Defendants filed their response (Dkt. #31). Plaintiff filed a reply on June 24, 2020 (Dkt. #46).

While Plaintiff's First Amended Application for Preliminary Injunction was pending, Defendants filed their Motion to Dismiss or, in the Alternative, to Transfer on June 3, 2020 (Dkt. #22).  In their motion to dismiss, all Defendants challenged the personal jurisdiction of this Court.

On June 19, 2020, Plaintiff filed an Emergency Motion for Temporary Restraining Order (Dkt. #35).  After a telephonic hearing with the parties, the Court granted Plaintiff's motion and issued a TRO (Dkt. #43).

The Court heard argument on both Plaintiff's First Amended Application for Preliminary Injunction and Defendants' Motion to Dismiss or, in the Alternative, to Transfer on July 1, 2020 (Dkt. #71). The parties also filed additional evidence—mostly deposition testimony and the accompanying exhibits—to support their arguments (Dkt. #56; Dkt. #57; Dkt. #58). The day after the hearing, the Court—having good cause to believe that Plaintiff had carried its burden on all four of the preliminary-injunction factors—extended a modified version of the TRO for fourteen days (Dkt. #63).

## LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

### I.    Plaintiff Is Entitled to a Preliminary Injunction Against Defendant SI

Plaintiff purports to request an injunction against all Defendants (Dkt. #19 at p. 4). The basis for Plaintiff's injunction is to prevent continuing trademark infringement, however (Dkt. #19

at pp. 4–5).[2]  Plaintiff asserts a trademark-infringement claim only against Defendant SI (Dkt. #15 at pp. 10–12).  So in analyzing Plaintiff's application for a preliminary injunction, the Court will not consider any actions committed by the individual defendants, Defendants Jeff and JJ Sutherland, in their individual capacities.[3]

The scope of Plaintiff's request for preliminary-injunctive relief affects a threshold personal-jurisdiction question, too.  Defendants, both in their response to this motion and in a separate motion to dismiss, challenge the Court's personal jurisdiction (Dkt. #31 at p. 11).  The Court may not issue a preliminary injunction without first finding that there is at least a reasonable probability of ultimate success on the question of jurisdiction when the action is tried on the merits.  But this finding must only be made as to the party "against whom the injunction runs."  *See infra* Section I.A.  Since the injunction runs against Defendant SI, the Court does not address whether Defendants Jeff and JJ Sutherland, in their individual capacities, are subject to the Court's personal jurisdiction.

On the topic of the Court's personal jurisdiction over Defendant SI, though, the Court finds that Plaintiff has established that there is *at least* a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits.  *See infra* Section I.A.  Indeed, the Court has specific jurisdiction to hear Plaintiff's trademark-infringement claim over Defendant SI.  *See infra* Section I.A.

---

[2] More precisely, the basis of Plaintiff's application for a preliminary injunction is Defendant SI's violation of 15 U.S.C. § 1125(a)(1)(A) (Dkt. #19 at pp. 4–5).  Section 1125, "which encompasses trade dress infringement claims," also "covers a range of other claims, including trademark infringement."  *Test Masters Educ. Services, Inc. v. State Farm Lloyds*, 791 F.3d 561, 565 (5th Cir. 2015).

[3] That is not to say that Defendants Jeff and JJ Sutherland may violate the injunction, of course.  They may not.  *See* FED. R. CIV. P. 65(d)(2); *infra* p. 33.

After answering this jurisdictional threshold question, the Court moves on to conclude that Plaintiff is entitled to a preliminary injunction. The Court finds that Plaintiff has clearly carried the burden of persuasion on all four of the preliminary-injunction factors. *See infra* Sections I.B, I.C, I.D, I.E.

### A. There Is At Least a Reasonable Probability Plaintiff Will Succeed on the Question of Personal Jurisdiction When Its Trademark-Infringement Claim Is Tried on the Merits

In opposing Plaintiff's application for a preliminary injunction, Defendant SI argues that Plaintiff's application should be denied because the Court lacks personal jurisdiction (Dkt. #31 at pp. 11–12).[4] The Court is unpersuaded.

Plaintiff's trademark-infringement claim against Defendant SI is the only basis for its application for a preliminary injunction (Dkt. #19 at pp. 3–4). The Court concludes that Plaintiff has "adequately establish[ed] that there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits" with regard to this claim. *Enter. Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471 (5th Cir. 1985) (quoting *Visual Scis., Inc. v. Integrated Commc'ns Inc.*, 660 F.2d 56, 59 (2d Cir. 1981)). Indeed: (1) Defendant SI has purposely directed its activities toward Texas and purposely availed itself of the privileges of conducting activities here; and (2) Plaintiff's trademark-infringement claim arises out of or results from Defendant SI's forum-related contacts. And though Defendant SI claims that the Court's exercise of personal jurisdiction would be unfair or unreasonable, the Court rejects that argument.

---

[4] Defendants incorporate by reference their personal-jurisdiction argument from their pending motion to dismiss to argue that the Court cannot issue a preliminary injunction (Dkt. #31 at pp. 11–12). And though Defendants also reference in passing the improper-venue and § 1404-transfer arguments as a reason to deny the preliminary injunction, Defendants cite to no case law holding that a court cannot issue a preliminary injunction while improper-venue and § 1404-transfer arguments remain pending. *See* (Dkt. #31 at pp. 11–12). Accordingly, the Court need not rule on Defendants' motion to dismiss prior to issuing this preliminary injunction against Defendant SI.

So, the Court has authority to issue a preliminary injunction over Defendant SI's objection that the Court lacks personal jurisdiction. *See id.* at 470–71 ("Because Rule 65 confers no jurisdiction, the district court must have both subject matter jurisdiction and 'in personam jurisdiction over the party against whom the injunction runs . . . .'"). But the Court need not decide whether Defendants Jeff and JJ Sutherland, in their individual capacities, are subject to the Court's personal jurisdiction at this time since the preliminary injunction only "runs" against Defendant SI. *See supra* Section I.

### i.   Personal-Jurisdiction Standard

The Texas long-arm statute confers jurisdiction to the limits of due process under the Constitution. *Command-Aire Corp. v. Ont. Mech. Sales and Serv. Inc.*, 963 F.2d 90, 93 (5th Cir. 1992). Therefore, the sole inquiry is whether personal jurisdiction offends or comports with federal constitutional guarantees. *Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir. 1990). The Due Process Clause permits the exercise of personal jurisdiction over a non-resident defendant when the defendant has established minimum contacts with the forum state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Plaintiff argues that the Court has specific personal jurisdiction over Defendant SI (Dkt. #15 at p. 4). Specific jurisdiction is proper when the plaintiff alleges a cause of action that grows out of or relates to a contact between the defendant and the forum state. *Helicopteros Nacionales de Colum., S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). For the Court to exercise specific jurisdiction, the Court must determine:

> (1) whether the defendant has . . . purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).

Defendants who "'reach out beyond one state' and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for consequences of their actions." *Burger King Corp.*, 471 U.S. at 475 (quoting *Travelers Health Assoc. v. Virginia*, 339 U.S. 643, 647 (1950)). Establishing a defendant's minimum contacts with the forum state requires contacts that are more than "random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *Id.*

"If the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). In this inquiry, the Court examines five factors: (1) the burden on the nonresident defendant; (2) the forum state's interests; (3) the plaintiff's interest in securing relief; (4) the interest of the interstate judicial system in the efficient administration of justice; and (5) the shared interest of the several states in furthering fundamental social policies. *Burger King*, 471 U.S. at 477. "It is rare to say the assertion of jurisdiction is unfair after minimum contacts have been shown." *McFadin v. Gerber*, 587 F.3d 753, 760 (5th Cir. 2009) (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)).

### ii.    Personal Jurisdiction Over Defendant SI

Defendant SI disputes all three prongs of the personal-jurisdiction inquiry. First, Defendant SI asserts that none of its activities have any connection to Texas (Dkt. #22 at p. 18). Next, Defendant SI argues that Plaintiff's "allegations that [Defendant SI] conducted a few trainings in the state of Texas does not establish specific jurisdiction because there is no nexus between those trainings and the alleged improper conduct" (Dkt. #22 at p. 19). Finally, Defendant SI argues that the Court's exercise of personal jurisdiction over it would offend traditional notions

of fair play and substantial justice" (Dkt. #22 at p. 21).  The Court disagrees.  Plaintiff has "adequately establish[ed] that there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits" with regard to its claim of trademark-infringement against Defendant SI.

### a.   Minimum Contacts

Defendant JJ Sutherland testified in his deposition that Defendant SI has taught at least five courses in Texas—four in Houston and one in Dallas (Dkt. #55 at p. 24; Dkt. #57, Exhibit 1 at p. 24).  One of those courses was taught to Schlumberger in early 2019 (Dkt. #55 at p. 35; Dkt. #57, Exhibit 1 at p. 35).  Schlumberger is a large corporation in Houston (Dkt. #55 at p. 25; Dkt. #57, Exhibit 1 at p. 25).  There were at least two, and up to five, of Defendant SI's employees in charge of running the in-person classes (Dkt. #55 at p. 25; Dkt. #57, Exhibit 1 at p. 25).  Defendant JJ Sutherland testified that this Schlumberger project went on for a "few months," though Defendant JJ Sutherland could not recall exactly how many (Dkt. #55 at p. 28; Dkt. #57, Exhibit 1 at p. 28).

For these few months, Defendant SI's employees—as is normal for an important project—were "on the ground" in Houston "three to four days a week, two to three weeks a month."  *See* (Dkt. #55 at p. 52; Dkt. #57, Exhibit 1 at p. 52).  There were also telephone conversations, emails, and texts sent between Defendant SI and Schlumberger (Dkt. #55 at pp. 55–56; Dkt. #57, Exhibit 1 at pp. 55–56).  And the months of training in Houston resulted in Defendant SI issuing Schlumberger's employees Licensed Scrum Certificates (Dkt. #55 at pp. 31–33; Dkt. #57, Exhibit 1 at pp. 31–33).[5]

---

[5] Defendant JJ Sutherland became rather shifty when asked—several times—whether Defendant SI's employees held themselves out to Schlumberger as "Licensed Scrum Trainers," though Defendant JJ Sutherland agreed that Schlumberger's employees were not trained by a "Certified Scrum Trainer" (Dkt. #55 at pp. 31–34; Dkt. #57, Exhibit 1 at pp. 31–34).

Adding to Defendant SI's contacts with Texas, Defendant JJ Sutherland admitted to personally teaching a "Certified ScrumMaster course" near Dallas for two days sometime in 2019 (Dkt. #58, Exhibit 1).  The revenue from that course—which was significant for just a few days' work—went to Defendant SI (Dkt. #58, Exhibit 1).[6]

On these facts, Defendant SI's position that it does not have minimum contacts with Texas is almost unfathomable.  Defendant SI has established minimum contacts with Texas.  Defendants like Defendant SI who "'reach out beyond one state' and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for consequences of their actions."  *Burger King Corp.*, 471 U.S. at 475 (quoting *Travelers Health Assoc. v. Virginia*, 339 U.S. 643, 647 (1950)).  In the last year or two, Defendant SI has conducted *at least* five in-person trainings within Texas.  Those trainings involved huge companies and spanned multiple months.  Defendant SI has without a doubt "'deliberately exploit[ed]' a market in the forum State . . . ."  *See Walden v. Fiore*, 571 U.S. 277, 285 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984)).

Indeed, Defendant SI knowingly directed its employees into Texas for months at a time to conduct lucrative in-person trainings within the state.  Because "[Defendant SI] deliberately permitted its employees to enter Texas[,] [i]t may not now escape liability resulting from its considered commercial decision."  *See Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 196–97 (5th Cir. 2019) ("LSM purposely availed itself of Texas when its employees voluntarily entered the jurisdiction . . . . LSM was hardly compelled to travel to Texas against its will."); *see also*

---

[6] The parties filed this portion of Defendant JJ Sutherland's deposition under seal pursuant to the parties' protective order in order to protect both the identity of the corporate student and the amount that the corporate student paid for the course.  The Court need not reveal these specifics to find that they support Plaintiff's personal-jurisdiction argument—the fact that this training was conducted in Texas and involved an allegedly infringing use of Plaintiff's trademark to generate significant revenue for Defendant SI is sufficient.

*Walden*, 571 U.S. at 285 ("physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact.").

Defendant SI's response to Plaintiff's presentation of this evidence at the July 1 hearing was that this conduct is not what "ruffled [Plaintiff's] feathers" because they've "known about those courses since 2017 and they have taken no action to stop private Licensed Scrum courses" (Dkt. #71 at pp. 83–84).  After the Court noted that "[it seems like] there is no question this Court has personal jurisdiction over SI," Defendant SI's only retort was that "that the private courses, which were in [Plaintiff's] own view non-infringing at the time, are not sufficient contact to establish specific jurisdiction over Scrum, Inc" (Dkt. #71 at pp. 84–85).  But Defendant SI does not explain why the personal-jurisdiction analysis should turn on what *Plaintiff* did or did not *think* about Defendant SI's conduct.  *C.f. Walden*, 571 U.S. at 286 ("it is likewise insufficient to rely on . . . the 'unilateral activity' of a plaintiff.").  Personal jurisdiction is established by "the relationship among the defendant, the forum, and the litigation."  *Id.* (quoting *Calder v. Jones*, 465 U.S. 783, 788 (1984)).  And Defendant SI has not meaningfully contested that it targeted the Texas market, repeatedly sent employees into Texas, and profited off its growing Texas contacts.  Defendant SI has established minimum contacts with Texas.

### b.  Nexus Between Forum Contacts and Plaintiff's Trademark-Infringement Claim

Plaintiff's trademark-infringement claim against Defendant SI arises out of or results from Defendant SI's contacts with Texas.  Plaintiff alleges Service Mark Infringement, False Affiliation, False Advertising, Unfair Competition, and Trademark Infringement against Defendant SI (Dkt. #15).  But Plaintiff's application for a preliminary injunction is based solely on its § 1125 trademark-infringement claim against Defendant SI (Dkt. #19 at pp. 7–8).  So, for the purposes of this preliminary-injunction-based analysis, the Court considers only whether Plaintiff has

11

"adequately establish[ed] that there is at least a reasonable probability of ultimate success" regarding whether Plaintiff's trademark-infringement claim against Defendant SI arises out of or results from Defendant SI's contacts with Texas.  *See Enter. Intern.*, 762 F.2d at 470–71.[7]  The Court finds that Plaintiff has made this showing.

After Defendant SI completed its months-long training in Houston for Schlumberger, it issued Schlumberger's employees Licensed Scrum Certificates (Dkt. #55 at pp. 31–33; Dkt. #57, Exhibit 1 at pp. 31–33).  And Defendant JJ Sutherland admitted to personally teaching a "Certified ScrumMaster course"—Plaintiff's course using Plaintiff's Marks—on behalf of Defendant SI in Texas (Dkt. #58, Exhibit 1).  Both these actions go to the heart of Plaintiff's trademark-infringement claim: If Plaintiff is correct, Defendant SI—by issuing "Licensed Scrum Certificates" and teaching a "Certified ScrumMaster course" in Texas—infringed on Plaintiff's legally protectable trademarks (Dkt. #19 at pp. 8, 10–11).  This forum-related contact is what "creates a likelihood of confusion as to source, affiliation, or sponsorship" of Plaintiff's trademarks (Dkt. #19 at pp. 8, 10–11).

As the Court explained to Defendant SI's counsel during the July 1 hearing:

[MR. KLETTER:] They've known about those courses since 2017 and they have taken no action to stop private Licensed Scrum courses.

THE COURT: But that's not the issue.  That's not the issue for personal jurisdiction.

. . .

THE COURT: I mean, you did—in-person trainings happened that happened using the trademark terms.  I think you used Licensed versus Certified, but that is exactly what this cause of action and these claims are about.

---

[7] *See generally Carmona*, 924 F.3d at 198 n.16 ("Carmona suggests that because he has raised only one *type* of claim— i.e., negligence—the court need not analyze specific jurisdiction on a claim-by-claim basis.  But it matters not that Carmona's allegations all sound in negligence; the court must separately consider specific jurisdiction for each claim that arises from different forum contacts.").

(Dkt. #71 at p. 84).  To which Defendant SI responded:

> MR. KLETTER: Right.  But Mr. Babcock made the very key distinction about the
> difference between private courses and public courses.  And the key distinction that
> [Plaintiff] made is once the private courses started, that's when the infringing
> conduct came about.  And if we're tying the jurisdiction to the cause of action and
> the Defendant's contacts, then it's our position that the private courses, which were
> in [Plaintiff's] own view non-infringing at the time, are not sufficient contact to
> establish specific jurisdiction over [Defendant SI].

(Dkt. #71 at pp. 84–85).

Just as with its minimum-contacts argument, Defendant SI's nexus argument leaves much

to be desired.  Even when pushed directly by the Court to explain its position that Plaintiff's

trademark-infringement claim does not arise out of its Texas contacts, Defendant SI rested on the

fact that "the private courses, which were in [Plaintiff's] own view non-infringing at the time, are

not sufficient contact to establish specific jurisdiction over [Defendant SI]"  (Dkt. #71 at pp. 84–

85).

First, the Court remains unsure why Defendant SI argues that the classes it offered in Texas

were "in [Plaintiff's] own view non-infringing at the time" and that Plaintiff knew about those

classes (Dkt. #71 at pp. 84–85).  As the Court pointed out during the July 1 hearing, that is "not

the issue for personal jurisdiction" (Dkt. #71 at p. 84).  Defendant SI has not asked the Court to

decide whether a statute of limitations has run, nor whether equity precludes Plaintiff from

bringing its trademark-infringement claim.  Defendant SI has instead asked the Court to hold that

it would offend the Due Process Clause for it to be haled into a Texas court.  The Court does not

see how Defendant SI's theory—that Plaintiff knew of the classes—is relevant to the personal-

jurisdiction analysis.[8]

---

[8] Take for example an out-of-state intentional tortfeasor, who concedes to all the personal-jurisdiction elements except
for the nexus element.  The plaintiff asserts that the forum has specific personal jurisdiction over the intentional
tortfeasor because the intentional tort was committed in the forum.  The intentional tortfeasor agrees that the
intentional tort was committed in the forum but claims that the plaintiff knew about its commission and did not

Second, Defendant SI's response simply reiterates its minimum-contacts argument.  *See* (Dkt. #71 at pp. 84–85) ("then it's our position that the private courses . . . *are not sufficient contact to establish specific jurisdiction over [Defendant SI].*") (emphasis added).  The Court has already rejected this argument.  *See supra* Section I.A.ii.a.

Defendant SI has established minimum contacts with Texas.  And Plaintiff's trademark-infringement claim arises out of or results from those contacts.  So the Court has the power to issue Plaintiff's requested preliminary injunction unless Defendant SI can establish that the Court's exercise of jurisdiction over it would offend traditional notions of fair play and substantial justice. Defendant SI tries but fails to make that showing.

### c.   Fair Play and Substantial Justice

Defendant SI argues that even if it would otherwise be subject to the personal jurisdiction of this Court, the Court's exercise of jurisdiction over it would "offend 'traditional notions of fair play and substantial justice'" (Dkt. #22 at p. 21).  Defendant SI claims—in conclusory fashion— that:

> (1) Massachusetts is the hub of Defendants' activities; (2) it will be unduly burdensome and costly for Defendants to litigate in Texas; (3) Texas has little or no interest in the subject of the dispute; and (4) the resolution of the dispute in Colorado or Massachusetts will likely be more efficient.

(Dkt. #22 at p. 22).  This purportedly makes the Court's exercise of jurisdiction over Defendant SI offensive to "fair play and substantial justice" (Dkt. #22 at pp. 21–22).  The Court disagrees.

"It is rare to say the assertion of jurisdiction is unfair after minimum contacts have been shown."  *McFadin*, 587 F.3d at 760 (citation omitted).  This is not one of those rare cases.

---

immediately file suit afterwards.  Does that give the intentional tortfeasor a possible defense on the merits of the plaintiff's claim?  Perhaps.  But would that mean that the forum does not have *personal jurisdiction* over the intentional tortfeasor?  Of course not, and Defendant SI cites no case to suggest otherwise.

Defendant SI is not reasonably likely to succeed in showing that the Court's exercise of jurisdiction over it offends "fair play and substantial justice" when this case is tried on the merits.[9]

Defendant SI cites just one case in an attempt to carry its burden: *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370 (5th Cir. 1987).  There, the Fifth Circuit first "disagree[d] with the district court's conclusion that the 'stream of commerce' will support a finding of general jurisdiction," which was the only theory of personal jurisdiction that the plaintiff advanced.  *Bearry*, 818 F.2d at 375.  The Fifth Circuit explained that the defendant was "not 'doing business'" in Texas, and so, was not subject to general jurisdiction in Texas.  *Id.* at 376.

The Fifth Circuit then went on to hold, in the alternative, that "the exercise of general jurisdiction in this case would not be fair and reasonable."  *Id.* at 377 (citation omitted).  But even then, the Fifth Circuit acknowledged that while "the burden placed upon the defendant [was] real," that burden would "admittedly not [be] severe enough to overcome an assertion of specific jurisdiction" had the plaintiff successfully made that argument.  *Id.*  And the Fifth Circuit also explained that the suit implicated "virtually no distinct interest of Texas."  *Id.*  That is not the case here.

As an initial matter, Defendant SI does not even recognize—let alone grapple with—the Fifth Circuit's statement that the burden placed on the *Bearry* defendant was "admittedly not severe enough to overcome an assertion of specific jurisdiction."  Defendant SI knows that Plaintiff asserts specific, not general jurisdiction here (Dkt. #22 at p. 20).  Yet Defendant SI rests its argument that the Court's exercise of specific jurisdiction would be "unduly burdensome and costly" on *Bearry*.  The case itself belies Defendant SI's argument.

---

[9] This is the standard Plaintiff must meet to establish that the Court has jurisdictional authority to preliminarily enjoin Defendant SI—it only makes sense that the same standard applies where Defendant SI bears the burden of proof at this stage.  *C.f. Enter. Intern*, 762 F.2d at 471.

And also unlike the alternative holding Defendant SI cites from *Bearry*, Texas has a strong interest in the subject of this dispute.  As the Court detailed, see *supra* Section I.A.ii.a, Defendant SI has spent significant time in Texas and worked with large Texas-based corporations.  Defendant SI has also earned significant revenue from its forum contacts.  If Defendant SI is committing trademark infringement within Texas as Plaintiff claims, Texas and its citizens have a strong interest in this dispute.  Defendant SI's argument that it the Court's exercise of specific personal jurisdiction over it would offend "fair play and substantial justice" is erroneous.

Defendant SI purposely directed its activities toward Texas and purposely availed itself of the privileges of conducting activities in Texas.  Also, Plaintiff's trademark-infringement claim— the only claim relevant to Plaintiff's application for a preliminary injunction—arises out of or results from Defendant SI's forum-related contacts.  And Defendant SI has not shown that the exercise of personal jurisdiction is unfair or unreasonable.  So now, Defendant SI must answer for the consequences of its purposeful entry into Texas.

Because the Court finds that Plaintiff is reasonably likely to succeed on the question of personal jurisdiction over Defendant SI when Plaintiff's trademark-infringement claim is tried on the merits, the Court may proceed with the preliminary-injunction analysis.

### B.  Likelihood of Success on the Merits

Plaintiff has shown this it is likely to succeed on the merits of its trademark-infringement claim against Defendant SI.  The Lanham Act establishes liability against "[a]ny person who . . . uses in commerce any word, term, name, symbol, or device, . . . which . . . is likely to cause confusion, or to cause mistake . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . ."  15 U.S.C. § 1125(a)(1)(A).  The Lanham Acts also allows a district court to grant an injunction to prevent a violation of the Act. 15 U.S.C. § 1116(a).

"To succeed in a trademark infringement claim, a party must first show that it has a protectable right in the mark and, second, show that there is a likelihood of confusion between the marks." *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008) (per curiam). Plaintiff asserts that Plaintiff's Marks are legally protectable trademarks and that it is the senior user of Plaintiff's Marks (Dkt. #19 at p. 8). Defendant SI does not disagree. *See generally* (Dkt. #31 at pp. 12–18; Dkt. #46 at p. 2). So, Plaintiff has shown that it owns Plaintiff's Marks, which are three legally protectable trademarks, and that it is the senior user of those marks.

The only contested element then is whether Defendant SI's actions have created a likelihood of confusion. The Court finds that Plaintiff is likely to succeed in showing that Defendant SI's actions have created a likelihood of confusion. The Court considers the nonexhaustive "digits of confusion" to determine whether use of a mark creates a likelihood of confusion as to affiliation, sponsorship, or source. *Id.* at 310. These digits of confusion include the:

> (1) strength of the mark; (2) mark similarity; (3) product or service similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers.

*All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 508 (5th Cir. 2018) (collecting cases)

No one factor is dispositive. *Paulsson Geophysical Servs.*, 529 F.3d at 310. Indeed, "a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of confusion.'" *Id.* (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998)).

Here, Plaintiff has shown that nearly every factor weighs towards a likelihood of confusion, and Defendant SI does not articulate some reason to disregard the digits of confusion here. In weighing the digits of confusion, all but one either weighs in favor or heavily in favor of a

likelihood of confusion.  Plaintiff has accordingly shown a likelihood of success on the only contested element of its trademark-infringement claim.

###### i.   Type of Trademark

The "type of trademark" simply refers to the strength of the senior user's mark.  *Elvis Presley Enters.*, 141 F.3d at 201.  "The stronger the mark, the greater the protection it receives because the greater the likelihood that consumers will confuse the junior user's use with that of the senior user."  *Id.* (citation omitted).

"Strength of a trademark is determined by two factors."  *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 330 (5th Cir. 2008).  The first factor is "where the mark falls on a spectrum," with generic and descriptive marks getting less protection and arbitrary and fanciful marks getting more protection.  *Id.*  "The second factor is the standing of the mark in the marketplace."  *Id.*

The Court finds that this factor weighs in favor of finding a likelihood of confusion. Plaintiff's Marks are strong.  First, Plaintiff's Marks are all registered (Dkt. #19 at p. 9). Registration is prima facie evidence that the mark is inherently distinctive.  *All. for Good Gov't*, 901 F.3d at 507.  Even if Defendant SI successfully rebutted that presumption, Defendant SI agrees that Plaintiff's Marks are at least descriptive (Dkt. #31 at p. 13).  And "even a descriptive mark can be strong if it has obtained secondary meaning in the marketplace."  *Am. Rice*, 518 F.3d at 330–31.  Plaintiff will likely succeed in showing that Plaintiff's Marks have obtained secondary meaning in the marketplace.

Defendant SI does not dispute that Plaintiff's Marks have attained "incontestable" status (Dkt. #19 at p. 2).  *See* 15 U.S.C. § 1065.  Yet Defendant SI asserts that incontestable status "is ***not even relevant***" to the "analysis of likely confusion." (Dkt. #31 at p. 12) (emphasis in original). Defendant SI—boldness and italics aside—is wrong.  As the Fifth Circuit recently explained,

incontestability "shows the strength of the mark." *All. for Good Gov't*, 901 F.3d at 510 n.14 (citing *Am. Rice*, 518 F.3d at 330). Incontestability also "preclude[s] an infringement action from being 'defended on the grounds that the mark is merely descriptive.'" *Id.* (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 205 (1985)). Defendant SI baldly asserts that Plaintiff's Marks are weak because they are generic and descriptive without ever addressing this authority.

Defendant SI's only other argument—that third parties' "pervasive" use of similar marks shows the weakness of Plaintiff's Marks—is meritless. Defendant SI claims that the terms "Scrum Master" and "Scrum Product Owner" are used by twelve direct competitors, evincing the "widespread" use of marks that are nearly identical to Plaintiff's Marks (Dkt. #31 at p. 15). This, Defendant SI asserts, "establishes that [Plaintiff's Marks] are weak and that market participants are not likely to be easily confused" (Dkt. #31 at p. 15).

First—and most importantly—it is not the number of similar marks in use that is dispositive. Rather, the "key is whether the third-party use diminishes in the public's mind the association of the mark with the plaintiff." *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 479 (5th Cir. 2008). Defendant SI presents no such evidence. Meanwhile, Plaintiff has presented unrebutted evidence to the contrary (Dkt. #46 at p. 3).

Not to mention, the two cases Defendant SI cites for support are nowhere near analogous. The defendant in *Sun Banks of Florida, Inc. v. Sun Federal Saving & Loan Association* submitted evidence showing that *"over 4400* businesses registered" with the word "Sun" in their names. 651 F.2d 311, 316 (5th Cir. 1981) (emphasis added). And in the other case cited by Defendant SI—an unreported and nonprecedential decision—the defendant showed that there were "168 registered businesses using 'Citizens' in their names in the state . . . ." *Citizens Nat. Bank of Meridian v.*

*Citizens Bank of Phila. Miss.*, 35 F. App'x. 391 (5th Cir. 2002) (per curiam).   Conversely, Defendant SI claims there are twelve direct competitors here.  Defendant SI cites these two cases, but this is hardly the kind of extensive third-party use at issues in those cases.  Plaintiff has shown that Plaintiff's Marks are strong, so this factor weighs in favor of confusion.

### ii.    Similarity of Marks

"The similarity of the marks in question is determined by comparing the marks' appearance, sound, and meaning."  *Elvis Presley Enters.*, 141 F.3d at 201 (citation omitted).  The marks do not need to be identical.   Rather, "[t]he relevant inquiry is whether, under the circumstances of the use, the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated."  *Id.* (internal quotation omitted).

Defendant SI did not attempt to controvert Plaintiff's arguments on this factor—and with good reason.  Plaintiff has shown that this factor weighs heavily in favor of confusion.  This is a comparison of the marks; Plaintiff's Marks are on the left, and Defendant SI's Allegedly Infringing Marks are on the right:

| | |
|---|---|
| CERTIFIED SCRUMMASTER | LICENSED SCRUM MASTER |
| CERTIFIED SCRUM TRAINER | LICENSED SCRUM TRAINER |
| CERTIFIED SCRUM PRODUCT OWNER | LICENSED SCRUM PRODUCT OWNER |

(Dkt. #19 at pp. 10–11).

Obviously, the only relevant difference is that Defendant SI has substituted "LICENSED" for "CERTIFIED."   But even then, "licensed" and "certified" are synonymous.  *Compare Licensed*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Having official permission to do something, usu. as evidenced by a written certificate."), *with Certify*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("To attest as . . . meeting certain criteria."); *see also* MERRIAM-WEBSTER

THESAURUS, https://www.merriam-webster.com/thesaurus/licensed (last visited July 14, 2020) (listing "certified" as a synonym for "licensed").

"It is no answer" that Defendant SI's Allegedly Infringing Marks are "slightly different from" Plaintiff's Marks—particularly since "licensed" and "certified" mean almost the same thing. *C.f. All. for Good Gov't*, 901 F.3d at 511 ("It is no answer that Coalition's name is slightly different from Alliance's ('COALITION' instead of 'ALLIANCE'; 'BETTER' government instead of 'good' government) . . . ."). Plaintiff has established that the meaning and appearance of the marks are substantially similar and will likely cause consumers to believe that the two are somehow associated, see *id.*, which Defendant SI does not dispute. Accordingly, this factor weighs strongly in favor of a likelihood of confusion.

### iii. Similarity of Products or Services

"The greater the similarity between products and services, the greater the likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 202 (citation omitted). Defendant SI did not attempt to controvert Plaintiff's arguments on this factor. That is probably because Defendant SI admits that the parties offer identical services with the marks at issue (Dkt. #19 at p. 11). Here, Plaintiff has shown that this factor weighs strongly in favor of a likelihood of confusion because the services provided are exactly the same (Dkt. #57, Exhibit 14 at p. 131; Dkt. #71 at p. 33).

### iv. Identity of Purchasers

"The greater the overlap between the outlets for, and consumers of, the services, the greater the potential for confusion." *All. for Good Gov't*, 901 F.3d at 512. Plaintiff has shown that both services are offered to practitioners who want to be credentialed for a particular expertise within the Scrum framework (Dkt. #19 at p. 11). Defendant SI has no retort. Because the consumers of the services are exactly the same, Plaintiff has shown that this factor weighs strongly in favor of a likelihood of confusion.

### v.    Advertising Media Used

"[A]dvertising in similar media [i]s an indication that consumers might be confused as to the source of similar products."  *Id.* (alteration in original) (quoting *Am. Rice*, 518 F.3d at 332). Plaintiff provides evidence that both it and Defendant SI advertise their services through websites and social media (Dkt. #19 at p. 11).  Defendant SI argues that its marketing materials are "very different," but also that the fact that consumers "learn about [Defendant SI's] offerings on [Defendant SI's] *website* reduces any risk of potential confusion."  *See* (Dkt. #31 at p. 15) (emphasis added).

Defendant SI admits that it markets on the Internet, and it does not rebut Plaintiff's evidence that both parties advertise on social media.  So, this factor weighs in favor of confusion. *See Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 229 (5th Cir. 2009) ("Both companies use print advertisements, direct mailings, and Internet promotion.  The parties do not advertise in identical magazines, but they target the same class of buyers.  This supports an inference that the parties use similar advertising and marketing channels.").

### vi.    Defendant SI's Intent

"Intent alone can determine the likelihood of confusion . . . ."  *Fletcher's Original State Fair Corny Dogs, LLC v. Fletcher-Warner Holdings LLC*, 434 F. Supp. 3d 473, 494 (E.D. Tex. 2020).  Indeed, "[i]f a mark was adopted with the intent to confuse the public, that alone may be sufficient to justify an inference of a likelihood of confusion."  *Elvis Presley Enters.*, 141 F.3d at 203 (citation omitted).  And in some situations, "[a] showing that the defendant intended to use the allegedly infringing mark with knowledge of the predecessor's mark may give rise to a presumption that the defendant intended to cause public confusion."  *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 486 (5th Cir. 2004) (alteration in original) (quoting *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 151 n.2 (5th Cir. 1985)).

22

Plaintiff provides strong evidence that Defendant SI intended to cause confusion with Defendant SI's Allegedly Infringing Marks.   One of Defendant SI's former high-ranking employees, Joe Justice, submitted a declaration that Defendant SI intentionally chose its Allegedly Infringing Marks because they would be nearly identical to Plaintiff's Marks and would cause confusion in the market (Dkt. #19, Exhibit 3 ¶ 5).   Mr. Justice indicates that Defendant JJ Sutherland and Mr. Schneier, another employee of Defendant SI, told him to keep quiet about Defendant SI's intent and actions (Dkt. #19, Exhibit 3 ¶ 4).

Naturally, Defendant SI tries to discredit Mr. Justice by arguing that he is a disgruntled employee whose allegations "make no sense" (Dkt. #31 at p. 16).   But they do make sense in light of the other evidence before the Court.   Mr. Justice's allegation that he was told to keep quiet about Defendant SI's intent and actions is corroborated by a 2018 "Licensed Scrum Trainer" agreement created by Defendant SI (Dkt. #57, Exhibit 14 at p. 133; Dkt. #71 at p. 16).   In this agreement, Defendant SI included a term stating that "[t]he existence of the [Licensed Scrum Trainer] program and [Licensed Scrum Course] certifications[] is confidential information" (Dkt. #57, Exhibit 14 at p. 134; Dkt. #71 at p. 16).

The agreement also states that no party may, "under any circumstances[,] publish the existence of this relationship or the [Licensed Scrum Trainer] or [Licensed Scrum Courses] in a public forum without the express written consent of [Defendant SI]" (Dkt. #57, Exhibit 14 at p. 134; Dkt. #71 at p. 16).   All this secrecy—*after* Plaintiff's CEO directly asked Defendant JJ Sutherland whether Defendant SI was competing (Dkt. #57, Exhibit 1 at pp. 63–64; Dkt. #57, Exhibit 7; Dkt. #71 at pp. 12–15, 34–35)—corroborates Mr. Justice's sworn declaration. Defendant SI's attempt to brush Mr. Justice's testimony off as the testimony of a man with "demonstrated animosity" towards Defendant SI, without more, does not allow the Court to

conclude that Mr. Justice lied under oath—which is the logical upshot of Defendant SI's argument.[10]

This factor weighs heavily in favor of confusion. Mr. Justice's corroborated testimony shows that Defendant SI actually intended to use its Allegedly Infringing Marks to confuse the public. And even without Mr. Justice's declaration, the facts here support a presumption that Defendant SI intended to cause public confusion—Defendant SI had unquestionable knowledge of Plaintiff's Marks, yet its Allegedly Infringing Marks just replaced "certified" with a synonymous term. *See Scott Fetzer Co.*, 381 F.3d at 486 (5th Cir. 2004).

### vii.   Evidence of Actual Confusion

Evidence of actual confusion is unnecessary for a finding of likelihood of confusion, but it is the "best evidence" of confusion. *Elvis Presley Enters.*, 141 F.3d at 203. "To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion or consumer surveys." *Scott Fetzer Co.*, 381 F.3d at 486 (citation omitted). "[P]ost-sale confusion" is "relevant to a determination of a likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 204. Plaintiff has presented abundant evidence of actual confusion through both anecdotal instances of consumer

---

[10] Defendant SI attaches two declarations of their own in order to combat Mr. Justice's declaration. As Plaintiff points out, much of Mr. Justice's declaration goes unrebutted. Specifically, Defendant JJ Sutherland does not rebut Mr. Justice's allegation that he was told to keep quiet about Defendant SI's intent and actions (Dkt. #31, Exhibit 16 ¶¶ 39–40). Nor does Defendant JJ Sutherland rebut Mr. Justice's sworn assertion that, after having conversations with Defendant JJ Sutherland and Mr. Schneier, it became apparent that Defendant SI had chosen its Allegedly Infringing Marks because they were nearly identical to Plaintiff's Marks.

As for Mr. Schneier's declaration, he claims that "[w]e chose to use 'Licensed' as the centerpiece of our branding because we wanted to avoid using 'certified' or a variant, in order to distinguish our mark" (Dkt. #31, Exhibit 23 ¶ 12). Mr. Schneier also claims that he did not "tell Mr. Justice that [Defendant SI] or I intended to copy and use [Plaintiff's] program materials and content" (Dkt. #31, Exhibit 23 ¶ 11). If any allegations lack credibility, these do—as the Court already discussed, the terms "licensed" and "certified" are commonly synonymous. *See supra* Section I.B.ii. And though Mr. Schneier claims he did not *tell* Mr. Justice that he or Defendant SI intended to copy and use Plaintiff's program materials and content, the substance of this—admittedly, qualified—statement is contradicted by emails showing that Defendant SI *explicitly* copied "LOs," or "learning objectives," from Plaintiff (Dkt. #57, Exhibit 14 at pp. 131–32; Dkt. #71 at p. 33). Defendant SI's own website even trades on the similarities: "Pass the Certified Scrum Master (CSM) or Licensed Scrum Master (LSM) test and earn your credential" (Dkt. #19 at p. 6).

confusion and consumer surveys.  Accordingly, this factor weighs heavily in favor of a finding of likelihood of confusion.

### a.  Anecdotal Instances of Consumer Confusion

Plaintiff presents evidence of actual confusion from two consumers.  One consumer complained that, while she had taken *Defendant SI's "Licensed Scrum Master" course*, she had not received her certification email from *Plaintiff*.  The other consumer—noting that he was "slightly confused"—asked whether the credits he earned during his "2-day 16 hours Licensed Scrum Master course" offered by *Defendant SI* would apply towards *Plaintiff's* "CSM [Certified ScrumMaster]," which *Defendant SI's website* represented as being correct.  Not to mention, both emails were sent to *Plaintiff's support desk*, despite the two consumers having taken *only* Defendant SI's course.  *See* (Dkt. #19, Exhibit 1 ¶¶ 29–30; Dkt. #19, Exhibits 27–28) (emphasis added).

Defendant SI retorts by claiming that the "timing" of Plaintiff's "discovery" aligns "perfectly, and far too conveniently, with a failed mediation in the arbitration between the parties" (Dkt. #31 at p. 16).  Defendant SI's argument is erroneous in more ways than one: First, the consumers' emails are timestamped; one was submitted on May 1, 2020, and the other was submitted on May 15, 2020 (Dkt. #19, Exhibits 27–28).  Plaintiff filed its application for a preliminary injunction on May 29, 2020.  Had Defendant SI bothered to check the timestamp on the emails, it would be clear exactly when they were sent.  Second, it does not alter the analysis one bit what Plaintiff's motivation was in introducing this evidence of actual confusion.  Whatever Plaintiff's motivation, short of showing that Plaintiff fabricated the evidence—which Defendant SI does not claim—the evidence is relevant.  Defendant SI will have to do better if it wants the Court to disregard this highly probative evidence.

Defendant SI, citing an unreported, nonprecedential decision, next claims that Plaintiff's anecdotal evidence is not relevant because evidence of actual confusion among existing consumers is "insufficient as a matter of law" (Dkt. #31 at p. 17). But even then—in the very case Defendant SI cites—it states: "The relevant inquiry is whether use of the mark produces confusion in potential customers" who are "seeking to differentiate between" two services. *See Citizens Nat. Bank*, 35 F. App'x. at *2 (collecting cases).

This is exactly the evidence of anecdotal actual confusion Plaintiff produced—the two emails were clearly Plaintiff's potential customers because they both were emailing to ask when they would receive the certification they thought they purchased from Plaintiff (Dkt. #46 at p. 4). Of course, they were both just confused—they had already purchased courses from Defendant SI, not from Plaintiff. But this "post-sale confusion" is still "relevant to a determination of a likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 204.

Defendant SI tries one last time to rebut Plaintiff's anecdotal evidence of actual confusion. It fails again. Defendant SI claims that anecdotal evidence of actual confusion is probative only if it can be linked to a misrepresentation made by Defendant SI—because there was no misrepresentation, Defendant SI claims, the evidence is not probative (Dkt. #31 at p. 17). Defendant SI misapplies the case it cites.

In *Scott Fetzer*, the plaintiff's allegations focused on the defendant's yellow pages ad. 381 F.3d at 484. The plaintiff argued that "the words 'NEW' and 'Kirby,' though not juxtaposed," suggested that the defendant sold new Kirby vacuum cleaners, which was likely to confuse consumers. *Id.* For its anecdotal evidence of consumer confusion, the plaintiff relied on "instances in which customers have said they thought [the defendant] was an authorized Kirby dealer or an authorized Kirby repair shop." *Id.* at 487.

As the Fifth Circuit explained: "The problem with these anecdotes, however, is that no competent evidence connects them to any representation by" the defendant.  *Id.*  Indeed, "in many of these instances, customers assumed affiliation" based on the fact that the defendant sold—"with the approval of [the plaintiff]—KIRBY-brand rug shampoos and like products."  *Id.*  In fact, *none* of the anecdotal evidence had any "link to the [defendant's] yellow pages ad."  *Id.* at p 487 & n.5.  So, the plaintiff was unable to prove it was a "misleading representation" by the defendant, rather than a representation from "some other source," that caused a likelihood of confusion.  *Id.*  The situation is quite different here.

Here, the anecdotal evidence of actual confusion was directly caused by Defendant SI's representations.  Both consumers claimed to have taken Defendant SI's course.  This course was unquestionably taught using Defendant SI's materials.  After taking the course, these two consumers were confused—based on the representations made by Defendant SI through Defendant SI's website, materials, and use of the Allegedly Infringing Marks—about the relationship between Plaintiff and Defendant SI (Dkt. #46 at p. 4).  Unlike the plaintiff in *Scott Fetzer*, who presented no evidence of any link between the defendant's yellow pages ad and the alleged actual confusion, Plaintiff's evidence links the anecdotal evidence of confusion to Defendant SI's representations.

### b.    Consumer Surveys

Plaintiff also submits evidence of actual confusion in the form of a consumer survey submitted by Plaintiff's expert, Dr. Thomas Jukam.  Dr. Jukam's survey showed that 40% of respondents who saw the "Certified Scrum Master" and "Licensed Scrum Master" names in connection with project management experienced source confusion (Dkt. #19 at p. 13).  After adjusting the survey results with a control group, Dr. Jukam concluded that the survey showed a minimum source confusion of 28% (Dkt. #19 at p. 13).

Defendant SI, citing to its own expert, claims that Plaintiff's survey results are inadmissible (Dkt. #31 at p. 17). Defendant SI asserts that the survey design and process was fundamentally flawed because it did not ask respondents questions to establish that they were prospective customers (Dkt. #31 at p. 17). But even then, Defendant SI's expert opined that the actual level of confusion in Dr. Jukam's survey could be as high as 43.5% (Dkt. #31, Exhibit 25 ¶ 30). At *minimum*, Defendant SI's expert asserts that the actual level of confusion in Dr. Jukam's survey is 12.5% (Dkt. #31, Exhibit 25 ¶ 30).

First of all, Defendant SI has not shown that there were "serious flaws" in Dr. Jukam's survey sufficient to "make any reliance on that survey unreasonable" so that "[n]o reasonable jury could view the proffered survey as evidence of confusion among relevant consumers"—in other words, Defendant SI has not made a showing that Dr. Jukam's survey should be discounted entirely. *See RE/MAX Intern., Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 705 (S.D. Tex. 2009) (Rosenthal, J.) (citing *Scott Fetzer Co.*, 381 F.3d at 488). And if Dr. Jukam's survey cannot be disregarded, then his finding of a 28% minimum source confusion is sufficient evidence of actual confusion. *See* (Dkt. #19 at pp. 13–14) (collecting cases).

Yet even if Defendant SI's expert is correct—and the actual level of confusion in Dr. Jukam's survey is 12.5%—this also supports a finding of actual confusion. *C.f. Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) ("Approximately 15 percent of the individuals surveyed associated the Texon sign with EXXON. Another 23 percent associated the sign with gasoline, a gas station, or an oil company. . . . This survey constitutes strong evidence indicating a likelihood of confusion . . . ."); *see also RE/MAX Intern.*, 655 F. Supp. 2d at 706 (collecting cases) ("[C]ourts have upheld the finding of a likelihood of confusion based on survey results showing that as few as 10% of the respondents were confused.").

No matter whether Dr. Jukam is correct, Defendant SI's expert is correct, or the truth is somewhere in between, in all three scenarios, Plaintiff's evidence of actual confusion weighs heavily in favor of a finding of likelihood of confusion.

### viii.    Care Exercised by Potential Purchasers

"Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Smack Apparel Co.*, 550 F.3d at 483.   On the other hand, purchasers of a big-ticket item are ordinarily expected to be more careful, mitigating any confusion. *See RE/MAX Intern.*, 655 F. Supp. 2d at 707.

Defendant SI argues that this factor weighs heavily against a finding of confusion since the consumer base is "highly sophisticated" (Dkt. #31 at p. 16).   Plaintiff, though it did not address this factor in its application for a preliminary injunction, argues in its reply that this factor is at best neutral (Dkt. #46 at p. 5).   The Court agrees with Plaintiff.   While the consumer base here is likely to be more sophisticated, the "ordinary consumer of [a Scrum course], however, is not an expert in [Scrum]."   *See id.*   Indeed, that is likely why they are taking a course—so they can be trained and certified as a "Scrum Master."   Accordingly, this factor is at best neutral: While the consumers may be more sophisticated, the entire reason they would take a Scrum course is to *learn* about the Scrum framework and receive a certificate of completion—they are not already experts in the Scrum framework, or they would not need the course.

In sum: Taken together, "the balance of the factors point overwhelmingly" in Plaintiff's favor. *C.f. All. for Good Gov't*, 901 F.3d at 513.   And likelihood of confusion is the only disputed element of Plaintiff's trademark-infringement claim.   So, Plaintiff has shown it is likely to succeed on its trademark-infringement claim against Defendant SI.   This factor favors the issuance of a preliminary injunction.

C.  **Irreparable Harm**

"An irreparable injury is one that is more than *de minimis* and cannot be undone through monetary remedies." *Sparrow Barns & Events, LLC v. Ruth Farm Inc.*, 4:19-CV-00067, 2019 WL 1560442, at *8 (E.D. Tex. Apr. 10, 2019) (citing *Paulsson Geophysical Servs.*, 529 F.3d at 312). Plaintiff argues that a preliminary injunction in necessary to prevent Plaintiff from being irreparably harmed by Defendant SI's trademark infringement.  The Court agrees.

Plaintiff first asserts that in a trademark-infringement case, the Court "is entitled to presume" irreparable harm if the Court finds that Plaintiff is likely to succeed on the merits (Dkt. #19 at p. 14).  Plaintiff then argues that even without this presumption, the evidence shows that Plaintiff is being irreparably harmed (Dkt. #19 at p. 15).  Plaintiff argues that it has, and will continue to lose, business and customers if Defendant SI continues to infringe on Plaintiff's Marks (Dkt. #19 at p. 15).  Plaintiff also asserts that due to Defendant SI's use of confusingly similar marks, Plaintiff has lost the power to control its reputation and place in the market, another irreparable injury (Dkt. #19 at p. 15).  Last, Plaintiff asserts that it has suffered losses to its reputation and goodwill (Dkt. #19 at p. 15).

Defendant SI retorts that after the United States Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), Plaintiff is no longer entitled to a presumption of irreparable harm (Dkt. #31 at p. 18).  Defendant next argues that even without the presumption, Plaintiff's "nine-month delay" is fatal to its claims of irreparable harm (Dkt. #31 at p. 19).

The Court need not decide whether Plaintiff is entitled to a presumption of irreparable injury after the Supreme Court's *eBay* decision.[11]  Plaintiff has shown a substantial threat that it will suffer irreparable harm if the injunction is not granted.

Plaintiff argues that it has, and will continue to lose, business and customers if Defendant SI continues to infringe on Plaintiff's Marks (Dkt. #19 at p. 15).  This is an irreparable harm.  *See Paulsson Geophysical Servs.*, 529 F.3d at 313 (affirming grant of preliminary injunction where irreparable harm was shown in several ways, including through a loss of business and customers). Plaintiff also asserts that due to Defendant SI's use of confusingly similar marks, Plaintiff has lost the power to control its reputation and place in the market (Dkt. #19 at p. 15).  This is an irreparable harm.  *See Sparrow Barns*, 2019 WL 1560442, at *8; *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 696 (N.D. Tex. 2015).   And Plaintiff asserts that it has suffered losses to its reputation and goodwill (Dkt. #19 at p. 15).   This is an irreparable harm.   *See Paulsson Geophysical Servs.*, 529 F.3d at 313 ("Such damage to Paulsson's goodwill in Mexico and worldwide could not be quantified.   Thus, the damage to Paulsson could not be undone by monetary remedies.").

Defendant SI's argument of delay does not carry the day.   First, as Plaintiff noted, Defendant SI crossed a "critical threshold" when it *publicly* announced that it was using its "Licensed Scrum Program" to compete with Plaintiff's "Certified Scrum Program" in August of 2019 (Dkt. #19, Exhibit 1 ¶¶ 13–15; Dkt. #46 at p. 6).  And it was in May of 2020 that examples of *actual* consumer confusion came to Plaintiff's attention (Dkt. #19, Exhibit 1 ¶¶ 29–30; Dkt. #19,

---

[11] Even without analyzing *eBay*, the Fifth Circuit noted in *Paulsson* that it has "avoided 'expressly adopting this presumption of irreparable injury.'"   529 F.3d at 312 (quoting *S. Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185, 188 (5th Cir. Unit B 1982)).

Exhibits 27–28).  Plaintiff did not unreasonably delay in seeking an injunction so as to doom its claimed irreparable injuries.  *See* (Dkt. #46 at p. 6 n.7) (collecting cases).[12]

Because Plaintiff has shown a substantial threat that it will suffer irreparable harm if the injunction is not granted, this factor favors the issuance of an injunction.

### D.  Balance of Hardships

This factor favors the issuance of an injunction.  As Plaintiff correctly explains, the greater hardship will befall Plaintiff if the injunction is denied.  Plaintiff "has spent millions of dollars and almost twenty years creating" its brand (Dkt. #19 at p. 16).  Plaintiff has additionally shown that Defendant SI's conduct has and will cause Plaintiff to suffer irreparable injury in the form of loss of goodwill, reputation, customers, business, and place in the market.  *See supra* Section I.C. Defendant SI will suffer little comparable harm in stopping the use of the recently created and introduced Allegedly Infringing Marks.  *See T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 929 (S.D. Tex. 2014) (Rosenthal, J.) ("The harm to T–Mobile's brand, which it has spent billions of dollars and over ten years creating, substantially outweighs the remaining harms that Aio will suffer in stopping the use of large blocks or swaths of plum in its marketing and store appearance.")

### E.  Public Interest

"The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks."  *Id.* (quoting *Quantum*

---

[12] Additionally, Defendant SI's calculation of the delay's length is inaccurate.  Defendant SI claims that Plaintiff waited nine months to request an injunction, undermining its claimed irreparable injuries.  Ostensibly, Defendant SI made this calculation by counting back from when Plaintiff filed its *amended* application for a preliminary injunction in May of 2020—nine months after August of 2019 when Defendant SI publicly announced its competing courses. But the date Defendant SI should have counted back from is the date Plaintiff filed its *original* application for a preliminary injunction, which was in March.  Regardless, Defendant's undue-delay argument is unpersuasive.

*Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*, 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999) (Rosenthal, J.)); *see also Paulsson Geophysical Servs.*, 529 F.3d at 313.  So too, here.

## CONCLUSION

It is therefore **ORDERED** that Plaintiff's First Amended Application for Preliminary Injunction (Dkt. #19) is hereby **GRANTED**.

Accordingly, Defendant Scrum, Inc. and its agents, servants, employees, successors, assignees, and all others in concert and privity with Defendant Scrum, Inc. are hereby **ENJOINED** during the pendency of this action from, directly or indirectly, using the following terms in any way, for any means, or in any commercial setting:

CERTIFIED SCRUMMASTER

LICENSED SCRUM MASTER

CERTIFIED SCRUM TRAINER

LICENSED SCRUM TRAINER

CERTIFIED SCRUM PRODUCT OWNER

LICENSED SCRUM PRODUCT OWNER

It is further **ORDERED** that a bond of $5,000 shall be required to be posted by Plaintiff before this preliminary injunction is effective.

**IT IS SO ORDERED**.

 **SIGNED this 16th day of July, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE