**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

SCRUM ALLIANCE, INC.,                    :
                                         :
    Plaintiff,                           :
                                         :
             v.                     :        Civil Action No. 4:20-cv-00227
                                         :
SCRUM, INC.,                             :
JEFF SUTHERLAND, and                     :
JJ SUTHERLAND,                           :
                                         :
    Defendants.                          :
                                         :

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
<u>SURVEY EVIDENCE AND TESTIMONY OF DAVID FRANKLYN</u>**

## TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ...................................................................................... 2

A.    The Scrum Guide Defines Terms That Are Essential To Practicing Scrum....................... 2

B.    The Franklyn Survey.................................................................................................. 2

ARGUMENT ........................................................................................................... 4

A.    The Franklyn Survey Did Not Properly Define Or Screen The Survey Universe.............. 6

B.    The Screening Questions In The Franklyn Survey Introduced Demand Effects................ 9

C.    The Franklyn Survey Used Improper Control Stimuli. ................................................ 11

D.    Mr. Franklyn Improperly Coded Open-Ended Answers.............................................. 13

CONCLUSION ...................................................................................................... 15

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amstar Corp. v. Domino's Pizza*,
   615 F.2d 252 (5th Cir. 1980) ...................................................................6

*Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*,
   383 F.3d 110 (3d Cir. 2004)....................................................................7

*Cottonwood Fin. Ltd. v. Cash Store Fin. Servs., Inc.*,
   778 F. Supp. 2d 726 (N.D. Tex. 2011) ...................................................7

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)................................................................................4

*Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*,
   628 F.2d 500 (5th Cir. 1980) ...................................................................6

*Firebirds Int'l, LLC v. Firebird Rest. Grp., LLC*,
   No. 3:17-CV-2719-B, 2019 WL 3957846 (N.D. Tex. Aug. 21, 2019)....................12

*King-Size, Inc. v. Frank's King Size Clothes, Inc.*,
   547 F. Supp. 1138 (S.D. Tex. 1982) ........................................................6

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)................................................................................4

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*,
   452 F. Supp. 2d 772 (W.D. Mich. 2006), *aff'd on other grounds*, 502 F.3d 504
   (6th Cir. 2007)........................................................................................5

*NFL Props., Inc. v. N.J. Giants, Inc.*,
   637 F. Supp. 507 (D.N.J. 1986) ..............................................................5

*Paco Sport Ltd. v. Paco Rabanne Parfums*,
   86 F.Supp.2d 305 (S.D.N.Y. 2000)..........................................................7

*Pipitone v. Biomatrix, Inc.*,
   288 F.3d 239 (5th Cir. 2002) ...................................................................4

*RE/MAX Int'l, Inc. v. Trendsetter Realty*,
   LLC, 655 F. Supp. 2d 679 (S.D. Tex. 2009)............................................9

*Scott Fetzer Co. v. House of Vacuums*,
   381 F.3d 477 (5th Cir. 2004) ...........................................................5, 6, 9

*Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*,
    765 F. Supp. 2d 884 (S.D. Tex. 2011) .......................................................5

*Simon Prop. Grp. L.P. v. mySimon, Inc.*,
    104 F.Supp.2d 1033 (S.D. Ind. 2000) .....................................................9

*Sunbeam Corp. v. Equity Indus. Corp.*,
    635 F.Supp. 625 (E.D. Va. 1986) ............................................................9

*THOIP v. Walt Disney Co.*,
    788 F.Supp.2d 168 (S.D.N.Y. 2011)........................................11, 12, 13, 15

*U.S. v. Kuhrt*,
    788 F.3d 403 (5th Cir. 2015) ...................................................................4

*Universal City Studios, Inc. v. Nintendo Co., Ltd.*,
    746 F.2d 112 (2d Cir. 1984)..................................................................6, 9

*Valador, Inc. v. HTC Corp.*,
    242 F.Supp.3d 448, 459 (E.D. Va. 2017) ...........................................6, 7, 8, 9

*Vargas v. Lee*,
    317 F.3d 498 (5th Cir 2003) ....................................................................5

*Viacom Int'l v. IJR Cap. Inv., L.L.C.*,
    891 F.3d 178 (5th Cir. 2018) ................................................................5, 6

*Water Pik, Inc. v. Med–Sys., Inc.*,
    726 F.3d 1136 (10th Cir. 2013) ...............................................................8

*Weight Watchers Int'l, Inc. v. Stouffer Corp.*,
    744 F.Supp. 1259 (S.D.N.Y. 1990).........................................................7, 9

**Other Authorities**

Diamond, S.S. (2011). REFERENCE GUIDE ON SURVEY RESEARCH IN REFERENCE
    MANUAL ON SCIENTIFIC EVIDENCE, 3rd ed., Federal Judicial Center and
    National Academies Press, p.388.............................................................5

Diamond, S.S. & Swann, J.B. (2012), *Trademark and Deceptive Advertising
    Surveys: Law, Science, and Design*. American Bar Association, Section of
    Intellectual Property Law, p.28................................................................8

Diamond, Shari Seidman, "Reference Guide on Survey Research," REFERENCE
    MANUAL ON SCIENTIFIC EVIDENCE, 3RD EDITION, Federal Judicial Center,
    p.399........................................................................................................11

Jacoby, J. (2013). TRADEMARK SURVEYS VOLUME 1, DESIGNING, IMPLEMENTING, AND EVALUATING SURVEYS. US: AMERICAN BAR ASSOCIATION, p.507 ............................... 12

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 11.493 ................................................. 5

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 11.493 ................................................. 5

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:171 (5th ed.) ............................ 15

6 MCCARTHY ON TRADEMARKS, § 32:1 ............................................................................... 5

6 MCCARTHY ON TRADEMARKS, § 32:159 ............................................................................. 6

6 MCCARTHY ON TRADEMARKS § 32:172 ............................................................................. 9

McCarthy on Trademarks and Unfair Competition § 32:187 (5th ed.) ......................................... 13

McCarthy on Trademarks and Unfair Competition § 32:189 (5th ed.) ......................................... 15

## INTRODUCTION

Scrum, Inc. ("SI"), Jeff Sutherland, and JJ Sutherland (collectively, "Defendants") move to exclude the testimony of the purported expert, David Franklyn, offered by Scrum Alliance, Inc. ("SAI").  SAI apparently intends to offer Mr. Franklyn to testify about a survey (the "Franklyn Survey") that he designed and constructed to determine whether there is any confusion in the relevant marketplace between SI's LICENSED SCRUM MASTER and SAI's CERTIFIED SCRUMMASTER marks.  In his report (the "Franklyn Report"), Mr. Franklyn states that the Franklyn Survey identified a "significant amount of confusion" in the marketplace.

This Court should entirely exclude the testimony of Mr. Franklyn, and any evidence regarding the Franklyn Survey, because the survey is fundamentally flawed in its design and interpretation.  The Franklyn Survey fails to comply with the basic principles of proper survey design set forth in the *Reference Guide on Survey Research* in the REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, the authoritative treatise published by the Federal Judicial Center.

First, Mr. Franklyn did not properly screen respondents to determine that they were potential purchasers of Scrum training courses; accordingly, there is no basis to believe that the respondents are part of the relevant universe.  Second, Mr. Franklyn's screening questions were leading and introduced "demand effects" that make the responses unreliable. Third, Mr. Franklyn's survey used improper control stimuli, such that it is not possible to conclude that any confusion was caused by the SI mark and not by other aspects of the websites that the respondents were shown.  Fourth, Mr. Franklyn made obvious errors in coding open-ended answers.  If they had been coded properly, the results are far below the thresholds that courts have considered to be probative of likely confusion.

1

Any one of these flaws would by itself be fatal; together they render the Franklyn Survey utterly invalid, unreliable, and inadmissible.

## FACTUAL BACKGROUND

**A.** **The Scrum Guide Defines Terms That Are Essential To Practicing Scrum.**

Defendant Dr. Jeff Sutherland is, with his colleague Ken Schwaber, the undisputed co-creator of Scrum. Dr. Sutherland and Mr. Schwaber are the co-authors of *The Scrum Guide™ – The Definitive Guide to Scrum: Rules of the Game*, the world's most authoritative text on Scrum, which defines the framework for Scrum, including the terms that comprise the marks at issue in this case,  such as "Scrum Master" and "Scrum Product Owner."  Even SAI recognizes that these terms are essential to doing Scrum and that they are free for everyone to use.  *See* Sublett Dep. 42:9-47:14 at Ex. C.

To capitalize on Dr. Sutherland's prominent and unique brand recognition in the Scrum community, SAI entered a joint venture with Scrum, Inc. in 2018, but because of SAI's breaches of its contractual and fiduciary obligations, the joint venture collapsed.  SI is pursuing arbitration in Delaware to recover the millions of dollars of damages it sustained from SAI's breaches.

To gain leverage in the arbitration, SAI conjured the argument that SI's LICENSED SCRUM marks infringe SAI's CERTIFIED SCRUM trademarks.  In truth, there are at least a dozen or so organizations around the world that offer various credentialing in the Scrum framework. All use "Scrum Master" and "Scrum Product Owner" as part of their marks, and many use "certified" or some variation.  The Scrum community recognizes that the LICENSED SCRUM marks are associated with SI and Dr. Sutherland.

**B.** **The Franklyn Survey.**

SAI intends to offer Mr. Franklyn to testify about a survey that he conducted.  Mr. Franklyn states that the aim of the survey was to "assess, using standard and generally accepted

statistical and consumer market research methods, the extent, if any, confusion that exists between the certification courses offered by Scrum Alliance, Inc, and Scrum, Inc."  Report of David Franklyn (attached as Exhibit A) ("Franklyn Rep."), at 3.  Relying on that survey, Mr. Franklyn offered his view that there was a likelihood of confusion between CERTIFIED SCRUMMASTER and LICENSED SCRUM MASTER. *See id.*, at 37; *see* Sowers Rebuttal Rep. at 15 at Ex. B.  Although SAI also contends that SI's LICENSED SCRUM PRODUCT OWNER and LICENSED SCRUM TRAINER marks are also infringing, the Franklyn Survey did ***not*** include those terms and the Franklyn Report does not offer any opinion whatsoever about them. *See id.*, at 6, 37-38; Sowers Rebuttal Rep. at 3, 4, 18.

As described in the Franklyn Report, respondents qualified for participation in the Franklyn Survey if they indicated that they participate in projects requiring project management software, and have completed a certification course for a project management framework in the past or are considering completing a certification course for a project management framework within the next 12 months.  Franklyn Rep. at 15, 16, 20, 21; Sowers Rebuttal Rep. at 3.

After administering the screener, respondents were shown an image from the SAI website and then were randomly assigned to one of three cells and shown a second image. In Cell A, respondents saw an image from the SI website for the LICENSED SCRUM MASTER course. In Cell B, respondents saw an image from a website for a third party, known as CompTIA. Franklyn Rep. at 8-12.  CompTIA apparently offers about thirteen different certifications in a variety of IT-related disciplines.   https://www.comptia.org/certifications.   One of those certifications is for a project management framework called Project+ that is "designed for business professionals who coordinate or manage small-to-medium-sized projects;" it does not include   training   in   Scrum,   and   only   a   high-level   introduction   to   Agile.

3

https://www.comptia.org/certifications/project.   In Cell C, respondents saw an image from the website for the Project Management Institute, a third party that offers a Project Management Professional certification program.  Franklyn Rep. at 13; Sowers Rebuttal Rep. at 6.

According to the Franklyn Report, respondents were presented with a question, below their respective second image, that "relat[ed] to source confusion" among the two certification courses that were shown.  Franklyn Rep. at 14.  If a respondent indicated a belief that the second program shown to them is "put out" by the same company they were shown in the first section of the survey, the respondent was then presented with the second image again and asked to explain why they believed that.  *Id.*  If a respondent indicated that the course shown in the second image was "put out" by a different company, the respondent was asked a follow-up question relating to sponsorship, approval, and affiliation. Respondents who indicated that they believed the course is affiliated with, or sponsored or approved by the company shown in the first section of the survey were asked to explain the basis for that belief.  *Id.* at 14-15.  Finally, each respondent was asked to identify if they had earned credentials in any project management frameworks. *Id.*

### ARGUMENT

Like all expert testimony, the admissibility of Mr. Franklyn's survey and purported expert testimony is governed by Fed. R. Evid. 702 and 703, which incorporate the standards set out in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *see also U.S. v. Kuhrt*, 788 F.3d 403, 419-20 (5th Cir. 2015)(affirming District Court's exclusion of expert testimony). Under those precedents, this Court exercises a gatekeeping function, to ensure that proffered expert testimony is both reliable and relevant.  *Kumho Tire Co.*, 526 U.S. at 141; *Pipitone v. Biomatrix, Inc*., 288 F.3d 239, 244 (5th Cir. 2002)(affirming exclusion of expert testimony).

As the proponent of Mr. Franklyn's testimony, SAI bears the burden of proving that the Franklyn Survey was (i) conducted according to generally accepted principles of survey research, and (ii) is sufficiently reliable to be admitted into evidence. See, e.g., *Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir 2003)(excluding unreliable expert testimony); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 777-78 (W.D. Mich. 2006), *aff'd on other grounds*, 502 F.3d 504 (6th Cir. 2007); *Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*, 765 F. Supp. 2d 884, 890 (S.D. Tex. 2011)(concluding fatal errors in the survey universe); *NFL Props., Inc. v. N.J. Giants, Inc.*, 637 F. Supp. 507, 513-14 (D.N.J. 1986).

As applied to a consumer survey, these rules require SAI to first prove that the survey properly defined the relevant universe, i.e., the segment of the population whose state of mind is relevant in this case. *Scott Fetzer Co. v. House of Vacuums*, 381 F.3d 477, 487 (5th Cir. 2004); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 11.493 ("whether the population was properly chosen and defined"); 6 MCCARTHY ON TRADEMARKS, § 32:1 ("[t]he first step in designing a survey" to gauge actual confusion "is to determine the 'universe' to be studied").

Next, SAI must establish that the Franklyn Survey posed questions that were clear, precise, and non-leading.  *See House of Vacuums*, 381 F.3d at 488 (leading questions "cannot be a true indicator of the likelihood of consumer confusion"); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 11.493 ("whether the questions asked were clear and not leading"); Diamond, S.S. (2011). REFERENCE GUIDE ON SURVEY RESEARCH IN REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 3rd ed., Federal Judicial Center and National Academies Press, p.388 (questions must be "clear, precise, and unbiased").

In many cases, methodological flaws in a survey only affect the weight to be given the survey evidence.  *Viacom Int'l v. IJR Cap. Inv., L.L.C.*, 891 F.3d 178, 197 (5th Cir. 2018); *House*

*of Vacuums*, 381 F.3d at 488.  However, when a survey is "'so badly flawed that it cannot be used to demonstrate ... the likelihood of consumer confusion,'" the trial court should exclude it. *Viacom Int'l*, 891 F.3d 197 (quoting *House of Vacuums*, 381 F.3d at 488 (quoting *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984))).  The Fifth Circuit has found consumer surveys so fatally flawed, for instance, when participants were non-representative and when the questions introduced demand effects or otherwise were improper. *See House of Vacuums* at 487–88 (excluding survey that only surveyed purchasers of the plaintiff's product and where questions suggested a connection between the marks); *Amstar Corp. v. Domino's Pizza*, 615 F.2d 252, 264 (5th Cir. 1980) (excluding survey that surveyed only the demographic that purchased plaintiff's products, and not the demographic that purchased the defendant's, and asking questions that invited associations between plaintiff and defendant).

The Franklyn Survey suffers from all of these flaws, and more.

## A.  <u>The Franklyn Survey Did Not Properly Define Or Screen The Survey Universe.</u>

"Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." 6 McCarthy on Trademarks, § 32:159; *accord Valador, Inc. v. HTC Corp.*, 242 F.Supp.3d 448, 459 (E.D. Va. 2017);  *King-Size, Inc. v. Frank's King Size Clothes, Inc*., 547 F. Supp. 1138, 1158 (S.D. Tex. 1982).

In this case, where SI is the junior user, SAI's claim alleges "forward confusion."  *See* Sowers Rebuttal Rep. at ¶20. The proper population for a forward confusion claim comprises prospective purchasers.  *See, e.g., Domino's Pizza, Inc.*, 615 F.2d at 264 ("The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services." (emphasis added)); *Exxon Corp. v. Texas Motor Exch. of Houston,*

6

*Inc.*, 628 F.2d 500, 507 (5th Cir. 1980); *Valador*, 242 F.Supp.3d at 459; *Paco Sport Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d 305, 322 (S.D.N.Y. 2000) ("The courts have held that to be probative on the issue of actual confusion, a survey must rely on responses of prospective purchasers of the products in question." (collecting cases)). "Respondents who are not potential consumers may well be less likely to be aware of and to make relevant distinctions ...than those who are potential consumers." *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1272 (S.D.N.Y. 1990); *see also Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004) (excluding survey where the respondents were not part of the relevant customer base); *see also Cottonwood Fin. Ltd. v. Cash Store Fin. Servs., Inc.*, 778 F. Supp. 2d 726, 757 (N.D. Tex. 2011).

Mr. Franklyn's definition of the relevant universe was far too broad.  In his survey, the universe was defined to include individuals who "indicate[d] that they participate in projects requiring project management software, and who have completed or are likely to complete a certification course for a project management framework."  Franklyn Rep. at 6.  The fact that an individual might "have completed or [is] likely to complete a certification course for a project management framework" does not establish that the individual had or would have any involvement in the selection of the training or credentialing provider.  *See id.*  The individual may work for a company or organization that enrolls employees into training or credentialing courses without any input from the employee as to which training or credentialing provider is used. Such respondents are not prospective customers and may never encounter the two marks at issue or have the potential to be confused. *See* Sowers Rebuttal Rep. at ¶20.

In addition, the two marks at issue belong to companies that provide Scrum framework training and credentialing, but respondents were never asked whether they had completed or

7

were considering completing a certification course for **Scrum** specifically. *See id.* at ¶21. In fact, respondents were not even required to be familiar with the Scrum framework to qualify for the Franklyn Survey. *See id.*

Given this, it's not surprising that Mr. Franklyn's screener data show that, out of the 585 respondents who completed the Franklyn Survey, nearly three-quarters (74.5%) indicated that they had "never heard of" or "know a little, but have never used" the Scrum project management framework. *Id.* at ¶22; *See* Franklyn Rep. at App. D. Thus, a **majority** of respondents in the Franklyn Survey were asked their opinions about a training course for which they have **little to no experience or knowledge**. Their opinions are about two trademarks that they may never encounter in the actual marketplace is irrelevant.

Accordingly, there is no basis to believe that any of Mr. Franklyn's respondents are part of the relevant survey universe. *See* Sowers Rebuttal Rep. at ¶23-24.  Surveys consisting of individuals whose state of mind is not relevant to the issue being tested "are likely to be excluded from evidence or given no weight by the court."  *See id.* at ¶24 (quoting Diamond, S.S. & Swann, J.B. (2012), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*. American Bar Association, Section of Intellectual Property Law, p.28).  This fundamental defect in the design of the Franklyn Survey makes the data unreliable and its conclusions invalid. *See id*. at ¶24;  *see, e.g., Water Pik, Inc. v. Med–Sys., Inc.*, 726 F.3d 1136, 1146 (10th Cir. 2013) (upholding exclusion of over-inclusive survey in a trademark dispute between two sellers of sinus-irrigation products, because the expert "selected respondents from those whom he regarded as potential purchasers of sinus remedies in general, not potential purchasers of sinus-irrigation products in particular");  *Valador*, 242 F.Supp.3d at 460-61 (excluding over-inclusive survey in dispute involving virtual reality product where the respondents included "men who enjoy virtual

8

reality entertainment" but not "in the market for a product" like the one at issue); *Weight Watchers*, 744 F.Supp. at 1272 (excluding over-inclusive survey in dispute involving diet food where the universe included respondents who "may not have been in the market for diet food of any kind").

**B. The Screening Questions In The Franklyn Survey Introduced Demand Effects.**

The Franklyn Survey was also fatally flawed because the questions used to screen respondents were improperly suggestive.  Suggestive questions render a survey unreliable by creating "demand effects" or "cues" from which a respondent can "infer the purpose of the survey and identify the 'correct' answers." 6 McCarthy on Trademarks § 32:172; *Valador*, 242 F.Supp.3d at 461.  Put differently, leading questions "bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items." *See Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1048 (S.D. Ind. 2000);  *RE/MAX Int'l, Inc. v. Trendsetter Realty*, LLC, 655 F. Supp. 2d 679, 705 (S.D. Tex. 2009).  "A survey question that begs its answer by suggesting a link between plaintiff and defendant cannot be a true indicator of consumer confusion." *House of Vacuums Inc.*, 381 F.3d at 488; *see also Sunbeam Corp. v. Equity Indus. Corp.*, 635 F.Supp. 625, 630 (E.D. Va. 1986) (survey questions that beg their answers cannot create an issue of fact) (quoting *Universal City Studios, Inc.*, 746 F.2d at 118 & n.8)).

The wording and structure of the Franklyn Survey screening questions created a demand effect as they clearly communicated to respondents which answer option(s) were "correct" or expected by the sponsor of the survey.  *See* Sowers Rebuttal Rep. at ¶27-28.  For example, screening questions Q10 and Q11 communicated to respondents that they were expected to

indicate that they had completed or are considering completing a certification course for a project management framework, and that saying so was necessary to qualify for participation in the survey. *See id.*  Rather than providing a list of response options for various certification courses that they had completed or are considering completing, to mask the "correct" answer in Q10 and Q11, respondents were directly asked if they have ever completed or are considering completing a certification course for a project management framework. *Id.* Mr. Franklyn did not take any steps to disguise the purpose of the survey or the qualifying answer options, thereby increasing the likelihood that unqualified respondents guessed their way into the survey. *Id.*

In addition, the screening questions communicated information that likely influenced respondents' answers to the key survey questions designed to measure confusion.  Screening question Q9 asked "Which of the following best describes your relationship with the following project management frameworks?" and thus primed respondents to evaluate the subsequent stimuli based on the type of project management framework each offered. *See id.* Indeed, respondents may not have thought to review the stimuli on this basis had they not been primed to do so. If the relevant universe is consumers who "indicate that they participate in projects requiring project management software, and who have completed or are likely to complete a certification course for a project management framework"  then there was no need to ask awareness of specific types of project management frameworks. *See* Franklyn Rep. at 15-16; *see* Sowers Rebuttal Rep. at ¶29.  By asking this question, Franklyn Survey created a demand effect where respondents use that information as part of their criteria in reviewing the subsequent stimuli when they may not have otherwise done so. *See id.*

10

Because the screening questions were biased and introduced demand effects, the Franklyn Survey is not reliable and should be excluded. *THOIP v. Walt Disney Co.*, 788 F.Supp.2d 168, 183 (S.D.N.Y. 2011) (excluding survey that created demand effects).

## C. The Franklyn Survey Used Improper Control Stimuli.

The Franklyn Survey was further flawed because it used bogus control stimuli that improperly inflated the results. In an experimental design, respondents are randomly assigned to either the test condition or the control condition. The purpose of a control condition is to filter survey noise (e.g., preexisting beliefs and experiences, random guessing, or guessing attributable to survey artifacts) from test cell results, to produce reliable net percentages.   Random assignment to experimental group ensures that any sources of survey noise are distributed in roughly equal levels across the test and control groups. *See* Sowers Rebuttal Rep. at ¶31.  If a control is created appropriately, the difference in the levels of respondent confusion between the test and control groups – the net confusion – can be attributed only to the allegedly infringing mark. This comparison is possible, however,  only if the only difference between the test and control stimuli are the aspects of the allegedly infringing mark.

"In designing a survey-experiment, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."  *See* Sowers Rebuttal Rep. at ¶32 (Diamond, Shari Seidman, "Reference Guide on Survey Research," REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 3RD EDITION, Federal Judicial Center, p.399).  The control question should use a mark similar enough to the actual mark that it provides an accurate measure of the confusion created by the accused mark, not by some other similarity.

"To fulfill its function, a control should 'share[ ] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." *See THOIP*, 788 F.Supp.2d at 183 (internal quotations omitted); *see Firebirds Int'l, LLC v. Firebird Rest. Grp., LLC*, No. 3:17-CV-2719-B, 2019 WL 3957846 (N.D. Tex. Aug. 21, 2019).  An appropriate control here would have been a modified image of the Scrum Alliance website with all references to "Certified Scrum Master" changed to another name. Mr. Franklyn, however, took the unusual approach of choosing websites for completely different companies, namely COMPtia and the and Project Management Institute.. Because each of Mr. Franklyn's control stimuli are entirely different websites, the test and control stimuli are dissimilar in many respects, more than just the allegedly infringing mark at issue.  Consequently, the Franklyn Survey cannot appropriately isolate and test the impact of the Licensed Scrum Master mark at issue. *See* Sowers Rebuttal Rep. at ¶34. Put another way, Mr. Franklyn's flawed controls cannot distinguish whether the net confusion is due to the allegedly infringing Licensed Scrum Master mark, or due to one or more of the other factors common to both the senior and junior user's webpage. *See id.*

This flaw is what is known as a "bogus control." *See id.* at ¶35. "Since the survey can legitimately claim it used a control, the uninformed may be persuaded that the survey has controlled what needed to be controlled for, when that is actually not the case." *See id*. at ¶35 (citing Jacoby, J. (2013). TRADEMARK SURVEYS VOLUME 1, DESIGNING, IMPLEMENTING, AND EVALUATING SURVEYS. US: AMERICAN BAR ASSOCIATION, p.507).

By selecting control stimuli that were radically different from the Scrum Alliance and Scrum, Inc. websites, Mr. Franklyn biased the experiment. Given the greater number of differences between the test and control stimuli, fewer respondents exposed to the control are

likely to indicate confusion.  *See id.* at ¶36.  For example, respondents in the control group may have been less likely to indicate confusion simply because neither company (CompTIA Project+ and Project Management Professional) has "Scrum" in its company name, whereas respondents in the test group may have been more likely to indicate confusion between Scrum Alliance and Scrum, Inc. simply because both have "Scrum" in their company name.  *See id.* at ¶36.  "Scrum" as part of a company name is not at issue, however, and thus it should appear in all stimuli to control for preexisting beliefs, guessing, and other forms of survey noise due to irrelevant elements.  Indeed, only "Scrum" as it pertains to the certification course should be modified in the control cells as that is the allegedly infringing element at issue. *See id.* at ¶36.

This flaw results in artificially deflated control percentages, which results in artificially higher levels of net confusion.  *See id.* at ¶37.  As a result, the Franklyn Survey very likely overestimated the actual level of likelihood of confusion due to defendant's use of the Licensed Scrum Master mark. *See id.* (quoting McCarthy on Trademarks and Unfair Competition § 32:187 (5th ed.).

Given these flaws Franklyn Survey controls are inadequate, and contrary to generally-accepted principles of research design. *See id.* at ¶38.  Consequently, the Franklyn Survey should be excluded.  *THOIP*, 788 F.Supp.2d at 183 (excluding survey that used control stimuli that created a very different look and feel from the test stimuli).

**D.  Mr. Franklyn Improperly Coded Open-Ended Answers**

The Franklyn Survey included open-ended questions that were intended to gather information about why a respondent believed that the SAI and SI marks were confusing.  *See* Sowers Rebuttal Rep. at ¶39.  Specifically, Question 207 asked: "Please explain in as much detail as possible what makes you think that the project management certification course shown

on this page is made or put out by the same company as the project management certification course you were shown in the first section of the survey?" Question 209 asked: "Please explain in as much detail as possible what makes you think the project management certification course shown on this webpage is affiliated with, or sponsored or approved by, the company whose project management certification course you were shown in the first section of the survey." *Id.*

Most of the respondents who were counted as "confused" in the Franklyn Report provided vague responses that were unrelated to the marks at issue. *See id.* at ¶40.  There is no way to determine whether these respondents are confused due to defendant's use of the LICENSED SCRUM MASTER mark or because of other elements that are irrelevant. The open-end responses should not be counted as evidence of confusion as it relates to the Licensed Scrum Master mark. *See id.* at ¶40.

The Franklyn Report also includes a list of thirty-three open-ended responses that Mr. Franklyn believes show that, "a significant proportion of respondents cite similarities when asked to provide a rationale for their source confusion between Certified ScrumMaster and Licensed Scrum Master."  Franklyn Rep. at 30. This analysis, and Mr. Franklyn's conclusions are deeply flawed.

The questions that Mr. Franklyn relies upon reference ***both*** the company and the course. For example, the Franklyn Survey question related to source confusion (Q206) asks whether the course is put out by the ***same company*** [emphasis added] or a ***different company*** [emphasis added] as the course they were shown in the first section of the survey. *See* Sowers Rebuttal Rep. at ¶42.  Those who responded "same company" were asked a follow up question (Q207) to determine why they think the course shown is made or put out by the ***same company*** [emphasis added] as the course they were shown in the first section of the survey.  *See id.*

14

As a result, it is impossible to determine whether the responses are evidence are referring to the company name or the name of the certification course. *See id.* at ¶43. "[T]reating inconclusive responses as definite, unqualified responses in final survey tabulations" is a methodological deficiency.  MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:171 (5th ed.)).  Nevertheless, Mr. Franklyn incorrectly counted responses such as "same company name" and "same business name" as evidence that consumers are confused due to the name of the certification course. None of these responses should have been counted as evidence of confusion in the Franklyn Report. The improper coding of open-ended responses is still another reason to exclude Mr. Franklyn's evidence.  *THOIP*, 788 F.Supp.2d at 182 (excluding survey where open-ended answers were improperly coded and inflated net confusion).

If only the open-ended responses that referred to the Certified Scrum Master and/or Licensed Scrum Master marks specifically or mentioned the certification course(s) generally are counted as evidence of confusion, the likelihood of confusion in the test group amounts to 5.8%. *See* Sowers Rebuttal Rep. at ¶44.  This is significantly different than the results reported in the Franklyn Report, and well below thresholds the courts have traditionally considered to be probative of likelihood of confusion. *See id.* at ¶44 (quoting McCarthy on Trademarks and Unfair Competition § 32:189 (5th ed.) "When the percentage results of a confusion survey dip below 10%, they can become evidence which will indicate that confusion is not likely.").

## CONCLUSION

In view of all these flaws, the Franklyn Survey is wholly unreliable and  invalid, and Mr. Franklyn's testimony should be excluded.

**BROWN RUDNICK LLP**

   */s/ Edward J. Naughton*
Edward J. Naughton (*pro hac vice*)
Jessica T. Lu (*pro hac vice*)

15

One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
enaughton@brownrudnick.com
jlu@brownrudnick.com

-and-

Dylan P. Kletter *(pro hac vice)*
Anthony J. Boccamazzo (*pro hac vice*)
Kelsey D. Bond *(pro hac vice)*
185 Asylum Street, 38th Floor
Hartford, CT 06103
Telephone: (860) 509-6500
Facsimile: (860) 509-6501
dkletter@brownrudnick.com
aboccamazzo@brownrudnick.com
kbond@brownrudnick.com

-and-

Andrew B. Ryan
Texas State Bar No. 24054464
Ryan Law Partners LLP
3811 Turtle Creek Boulevard, Suite 780
Dallas, Texas 75219
Telephone: (214) 347-7360
andy@ryanlawpartners.com

*Attorneys for Defendants Scrum, Inc.,*
*Jeff Sutherland, and J.J. Sutherland*

Dated:  November 13, 2020

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document was filed electronically on November 13, 2020, pursuant to Local Rule CV-5(a) and has been served on all counsel who have consented to electronic service. Any other counsel of record will be served by first class U.S. mail on this same date.


<u>/s/ Edward J. Naughton</u>
Edward J. Naughton *(pro hac vice)*

## <u>CERTIFICATE OF CONFERENCE</u>

Pursuant to Local Rule CV-7(h), I hereby certify that I conferred with counsel to Plaintiffs regarding Defendants' Motion to Exclude.  Plaintiff opposes the motion.


<u>/s/ Rebecca MacDowell Lecaroz</u>
Rebecca MacDowell Lecaroz *(pro hac vice)*

17