UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SCRUM ALLIANCE, INC., | § | |
| | § | |
| | § | |
| PLAINTIFF, | § | CIVIL ACTION NO. 4:20-CV-00227 |
| | § | |
| v. | § | |
| | § | JURY DEMANDED |
| SCRUM, INC., | § | |
| JEFF SUTHERLAND, and | § | |
| JJ SUTHERLAND, | § | |
| | § | |
| DEFENDANTS. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE**
**SURVEY EVIDENCE AND TESTIMONY OF DAVID FRANKLYN**

27416882v.1

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL BACKGROUND ................................................................................1

III.    ARGUMENT AND AUTHORITIES ....................................................................4

        A.      Expert testimony that is reliable and relevant is admissible ....................................4

        B.      The Franklyn study is reliable and relevant ..........................................5

                1.      The survey included the appropriate universe ............................................6

                2.      The screening questions did not introduce demand effects .......................9

                3.      The survey did not include improper control stimuli...............................10

                4.      Open-ended answers were not improperly coded.....................................12

        C.      Evidence of actual confusion in this litigation validates
                Franklyn's conclusions ........................................................14

IV.     CONCLUSION....................................................................................................14

CERTIFICATE OF SERVICE .........................................................................................15

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Amstar Corp. v. Domino's Pizza, Inc.*,
  615 F.2d 252 (5th Cir. 1980) ........................................................................5, 6

*Cross Trailers, Inc. v. Cross Trailer Manufacturing and Sales, LLC*,
  363 F. Supp.3d 774 (W.D. Tex. 2018)............................................................8

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).....................................................................................1, 4

*Elvis Presley Enter., Inc. v. Capece*,
  141 F.3d 188 (5th Cir. 1998) ..........................................................................14

*Gucci Am. Inc. v. Guess?, Inc.*,
  831 F.Supp.2d 723, 741 (S.D.N.Y. 2011)........................................................12

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp.2d 558 (S.D.N.Y. 2007)..............................................................10

*McNeil-PPC, Inc. v. Merisant Co.*,
  Civ. No. 04-1090, 2004 WL 3316380 (D. Puerto Rico 2004)...............................10

*Scott Fetzer Co. v. House of Vacuums Inc.*,
  381 F.3d 477 (5th Cir. 2004) ............................................................................4

*Spangler Candy Co. v. Tootsie Roll Industries, LLC*,
  372 F. Supp.3d 588 (N.D. Ohio 2019)..............................................................10

*Xtreme Lashes, LLC v. Xtended Beauty, Inc.*,
  576 F.3d 221 (5th Cir. 2009) ............................................................................8

## Other Authorities

Federal Rules of Civil Procedure 702 and 703 ...................................................4

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff Scrum Alliance, Inc. ("SAI" or "Plaintiff") files this Response to Scrum, Inc.'s ("SI"), Jeff Sutherland's, and JJ Sutherland's (together, the "Sutherlands" and, collectively with SI, "Defendants") Motion to Exclude Survey Evidence and Testimony of David Franklyn (the "Response"), and would respectfully show the Court as follows:

## I.
## INTRODUCTION

Defendants' motion, at best, suggests cross examination points which a jury might consider but certainly does not rise to the exacting *Daubert* standard that would justify exclusion of Professor David Franklyn's testimony.  As explained in detail below and in his Declaration (attached as Exhibit A) and expert report (*see* Doc. 116-2), Professor Franklyn implemented a survey that captured the relevant universe of respondents and appropriately screened their answers.  And the results of that survey are striking—they show a significant percentage of consumers in the relevant universe are confused as to the relationship between CERTIFIED SCRUMMASTER® and Licensed Scrum certification courses.  Doc. 116-2 at 26-30.  Professor Franklyn conducted a survey that comported with standard, frequently used research methods.  The motion to exclude his testimony should be denied.

## II.
## FACTUAL BACKGROUND

This case involves, *inter alia*, trademark-infringement and unfair competition claims resulting from Defendants' misuse of SAI's Incontestable Scrum Marks and use of SI's Infringing Marks.  *See generally* Doc. 87 (Plaintiff's Second Amended Complaint).  For decades, SAI has been the leader in the Scrum and Agile community, and it has developed the most widely recognized, popular, and successful certification courses and training programs under a line of

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO**
**EXCLUDE SURVEY EVIDENCE AND TESTIMONY OF DAVID FRANKLYN**                    **Page 1**

27416882v.1

Incontestable Scrum Marks: CERTIFIED SCRUMMASTER®, CERTIFIED SCRUM TRAINER®, and CERTIFIED SCRUM PRODUCT OWNER®.  Doc. 87 at ¶¶ 1, 15.

The Sutherlands, SI's founders and executives, completed SAI's certification courses and began offering SAI's certification courses and using SAI's Incontestable Scrum Marks through SI, which was a violation of the Sutherlands' limited use rights granted through their individual agreements with SAI.  *Id.* at ¶ 1, 18.  In 2019, SI announced a new Scrum credentialing program, Licensed Scrum, *id.* at ¶ 20, but discovery in this case has revealed that Defendants' plan for establishing a credentialing program began to take shape as early as March 2017, *id.* at ¶ 22.

SAI filed suit alleging breach of contract claims against the Sutherlands and trademark infringement and unfair competition claims against SI.  SAI also sought a preliminary injunction against SI, Doc. 19 (First Am. Application for Preliminary Injunction), which the Court granted following a hearing, Doc. 72 (Memorandum Opinion and Order, July 16, 2020).  In granting the preliminary injunction, the Court noted the similarities between the Incontestable Scrum Marks (on the left) and SI's Infringing Marks (on the right):

| | |
|---|---|
| CERTIFIED SCRUMMASTER | LICENSED SCRUM MASTER |
| CERTIFIED SCRUM TRAINER | LICENSED SCRUM TRAINER |
| CERTIFIED SCRUM PRODUCT OWNER | LICENSED SCRUM PRODUCT OWNER |

Doc. 72 at 3.

For trial, SAI retained Professor David J. Franklyn as an expert to determine whether confusion exists in the marketplace with respect to SAI's and SI's certifications.  Specifically, Professor Franklyn explained that he utilized standard, generally accepted statistical and consumer

market survey methods to assess any confusion that exists between the certifications offered by SAI and SI under their respective marks.  Doc. 116-2 at 3 (Expert Report of David J. Franklyn). To that end, he conducted a survey in which respondents within the interested universe (those who answered both that they participate in projects requiring project management software and that they have completed or were likely to complete a certification course for a project management framework) were surveyed in three cells (two control cells in which respondents were shown SAI's website and a leading competitor's website and a cell in which respondents were shown SAI's website highlighting the CERTIFIED SCRUMMASTER® program and then shown SI's website featuring the Licensed Scrum Master certification program).  *Id.* at 6.

Professor Franklyn developed three key findings based upon the survey:

1.  A significant percentage of consumers in the interested universe are confused as to the relationship between SAI's and SI's certification courses, with a preponderance being source confusion;

2.  A significant portion of respondents cite similarities in the name when asked to provide a rationale for their source confusion between CERTIFIED SCRUMMASTER® and Licensed Scrum Master; and

3.  The level of source confusion between CERTIFIED SCRUMMASTER® and Licensed Scrum Master did not vary based upon prior Scrum certification.

*Id.* at 7.

## III.
## ARGUMENT AND AUTHORITIES

### A.      Expert testimony that is reliable and relevant is admissible.

The rules governing expert testimony are found in Federal Rules of Civil Procedure 702 and 703, and the admissibility of such testimony is governed by standards announced by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  The Court's role is considered a gatekeeping function, to ensure that an expert's proffered testimony will be reliable and relevant.  *Daubert*, 509 U.S. at 589 (explaining that Rule 702 is the primary source for this requirement).  The Supreme Court has also described this inquiry as "a flexible one" in which the "overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission."  *Id.* at 594-95.

The validity of expert testimony involving a conducted survey is evaluated with two factors: "first, the manner of conducting the survey, including especially the adequacy of the universe; and second, the way in which participants are questioned."  *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004).  As to the adequacy of the universe, " 'the persons interviewed must adequately represent the opinions which are relevant to the litigation.' "  *Id.* (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980)).  When the claim pursued is one of trademark infringement, " 'the appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services.' "  *Id.* at 487-88.

The *House of Vacuums* case is instructive for evaluating expert testimony in trademark disputes.  There, a vacuum cleaner manufacturer alleged infringement of its "KIRBY" trademark by a dealer that sold both new and repaired "KIRBY" vacuums.  In attempting to prove consumer

confusion based upon a yellow pages advertisement, the manufacturer's expert used the manufacturer's customer list to create a survey universe exclusively of individuals who already owned a Kirby vacuum cleaner.  *Id.* at 487.  The Fifth Circuit explained that in constructing a universe exclusively of persons who had purchased the product directly from the manufacturer, the "group is uniquely familiar with [the manufacturer's] marketing and distribution techniques." *Id.* at 488.  Accordingly, the proffered survey "says nothing about the [dealer's] ad's effect on the class of potential consumers of new Kirby vacuum cleaners, a class that includes a large proportion of persons who have not yet purchased a Kirby." *Id.*  Thus, the survey universe could not "adequately represent the opinions which are relevant to the litigation." *Id.* at 487 (internal quotation omitted).  *See also Amstar*, 615 F.2d at 264 (rejecting a survey universe that included only those most likely to be in the consumer group for the plaintiff's product (women) and leaving out entirely the demographic group making up defendant's primary customer base (male college students)).

Finally, even when courts determine that a methodological flaw might exist in a survey, this traditionally bears only on the weight to be given the survey rather than its admissibility. *House of Vacuums*, 381 F.3d at 488.  It is only on the rare occasion when a survey is "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion" that the court may deem it inadmissible.  *Id.* (internal quotation omitted).

### B.    The Franklyn study is reliable and relevant.

Defendants' motion to exclude raises four critiques of Professor Franklyn's expert report: the survey improperly screened the survey universe, Doc. 116 at 6-9; the screening questions introduced demand defects, *id.* at 9-11; the survey used improper control stimuli, *id.* at 11-13; and open-ended answers were improperly coded, *id.* at 13-15.  None of these critiques has any merit,

*see generally* Franklyn Decl. (attached as Exhibit A), much less could they rise to the level of warranting the exclusion of Professor Franklyn's survey and testimony.  It should be noted here that Professor Franklyn is an experienced practitioner who has qualified as an expert survey witness in state and federal court, and whose testimony has never been excluded.

> 1.   *The survey included the appropriate universe.*

As Professor Franklyn explains in his declaration, potential survey respondents were eliminated from inclusion in the survey unless they met numerous criteria, including: they could be employed by companies that sell project management software or services; they were required to be at least 24 years of age; and they could not have job descriptions of intern or volunteer. Franklyn Decl. ¶ 5.  In addition to the forgoing screening questions, the survey universe was established by two critical inquiries: respondents were required to state that they had previously completed, or were considering completing within the next twelve months, a certification course for a project framework and they must have been aware of at least two project management framework platforms.  *Id.* at ¶ 6.  And a fictitious brand was included within the list of project management frameworks to ensure against respondents who were merely guessing.  *Id.*  Together, these questions produced a survey universe that included persons with a range of job descriptions and titles, who were all potential customers in the near future or recent past customers of SAI, SI, and/or their other competitors.  The Franklyn survey thus avoided the flaws identified by the Fifth Circuit in the cases Defendants cite in their motion—the survey did not include only prior customers of the trademarked brand (*House of Vacuums*) or only those in the demographic group likely to be customers of the trademarked brand to the exclusion of those likely to be customers of the allegedly infringing brand (*Amstar*).

Defendants' criticism that a survey universe crafted to include a variety of potential participants in a project management framework certification course—what the Fifth Circuit has called "a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services" *House of Vacuums*, 381 F.3d at 487-88—is thus too broad, is indeed a puzzling critique.  Professor Franklyn explains why Defendants' suggestion that the interested universe should be limited to corporate decision makers for the Scrum project management framework fails. Franklyn Decl. at ¶ 7-8.  He notes that Diamond and Swann indicate that "[w]hen designing a survey for a Lanham Act case, it is crucial to select a universe that corresponds with the group or groups of consumers whose state-of-mind is relevant to the particular legal issue involved in the case."  *Id.* at ¶ 7 (quoting Diamond, S.S. & Swann, J.B. (2012). Trademark and Deceptive Advertising Surveys: Law, Science, and Design. American Bar Association, Section of Intellectual Property Law, p. 27).

It is for this reason—the need to capture more than just one small segment of the potential consumer base—that Defendants are wrong to believe that only top-level corporate decision makers' confusion is relevant.  Franklyn Decl. at ¶ 8.  Indeed, not only have Defendants failed to produce evidence that (1) Scrum credentialing courses are only available to individuals in their capacity as corporate employees or (2) only top-level corporate executives determine who will take Scrum credentialing courses and which course or courses will be taken, the opposite is true. A substantial number of Scrum credentialing courses are open for enrollment to members of the public without any connection to their place of employment.  *See generally* Sublett Decl. (attached as Exhibit B); Franklyn Decl. at ¶ 8.  A substantial number of SAI's credentials have been earned by members of the general consuming public.  Sublett Decl. at ¶¶ 2-4.  Likewise, Defendants offer

numerous public courses that are available to anyone who goes to Defendants' website and registers for the class. *Id.* at ¶¶ 5-6. This confirms the propriety of the Franklyn survey universe.

Moreover, the survey's universe included a large number of corporate decision makers: 440 respondents held C-Level, Vice President, Director, or Manager roles, suggesting that the type of persons even Defendants acknowledge belong in the survey universe made up a significant portion of the survey universe. Franklyn Decl. at ¶ 9 (noting that respondents with these titles comprised 75.1% of the total survey sample).

Professor Franklyn's survey universe also reflects the importance of end-user confusion in the Court's likelihood of confusion analysis. For example, Professor Franklyn notes that: the end-user may decline to take the company's preferred in-house Scrum credentialing based upon his or her own understanding of the course provider; the end-user may enroll in credentialing courses offered to the public in addition to the in-house course; the end-user may be tasked with promoting and discussing Scrum project framework. *Id.* at ¶ 10. In each of these scenarios, end-user confusion as to the source of the training and the certification held is quite relevant to the ultimate confusion inquiry in this litigation. *See Cross Trailers, Inc. v. Cross Trailer Manufacturing and Sales, LLC*, 363 F. Supp.3d 774, 790 (W.D. Tex. 2018) ("The Fifth Circuit considers end user confusion in a likelihood of confusion claim[.]"); *see also Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 230 (5th Cir. 2009) (finding end user confusion relevant when presented with competing beauty product manufacturers who sold their products to health and beauty professionals, who in turn sold the products to end users). Because the survey included both corporate decision makers and individuals, all of whom stated that they have taken or were considering taking project management framework credentialing courses in the near future, the Franklyn survey universe was adequately tailored and appropriate to capture "a fair sampling of

those purchasers most likely to partake of the alleged infringer's goods or services." *House of Vacuums*, 381 F.3d at 487-88; *see also* Franklin Decl. at ¶ 10-11.

2.      *The screening questions did not introduce demand effects.*

Defendants next argue that the screening questions introduced demand effects. But Defendants and their rebuttal expert, Brian M. Sowers, ignore common survey practice for screening survey participants when determining whether they are appropriately within the survey universe. Franklyn Decl. at ¶ 12. Professor Franklyn also notes internal inconsistency within Sowers' criticisms regarding the screening questions—"on one hand he argues that the survey's universe was too broad and on the other he argues that there were demand effects that improperly guided survey participants to the correct answer" in the attempt to narrow respondents to those within the relevant universe. *Id.*

Moreover, Defendants' argument cannot survive their own demand-effect criticism. Sowers claims the Franklyn survey should have provided respondents with a list of specific project management frameworks to choose from when asked if they have ever completed or are considering completing a certification course. *Id.* at ¶ 13. But this would not solve the purported problem: respondents trying to "game the system" to gain entry into the survey's universe would merely be given a list of examples of project management framework courses that they could select as attended courses or courses they intended to participate in for the future. *Id.* Tellingly, Sowers' proposal could generate a significant demand effect because the list of examples would encourage respondents to select one or more prompted choices. *Id.*

Professor Franklyn thus confirms that the screening questions were appropriate—they were neither leading nor inclined to introduce demand effects. *Id.* at ¶ 14. Rather, they accomplished two significant goals: (1) providing a list of industry leading platforms which could lead to

respondents' awareness of Scrum and (2) blinding respondents from the fact that Scrum was the framework critical to the survey instrument.  *Id.*

Finally, Defendants' critiques of specific questions are misguided.  The brand funnel question (Q9) "was designed using principles well established in the world of market research, where consumers are shown a list of brands and asked to identify their relationship with each brand."  *Id.* at ¶ 15.  And the other questions of interest in the screener (Q8, Q10, and Q11) were asked "in a neutral way" and offered the option to indicate in the positive or in the negative, as well as the option to answer that they did not know or had no opinion.  *Id.*  "This is not improper, did not introduce demand effects, and is in line with general litigation survey practices."  *Id.*

### 3.    *The survey did not include improper control stimuli.*

Defendants complain that the Franklyn survey used improper control stimuli because it used a "bogus control" that was "radically different" from SAI's and SI's websites.  Franklyn Decl. ¶ 16.  "But Defendants overlook a critical aspect of selecting a control: avoiding a control that is itself infringing."  *Id.*  "It is firmly established that '[i]f ... the control stimulus in a case of alleged trademark infringement is itself a likely source of consumer confusion, reactions to the experimental and control stimuli may not differ because both cause respondents to express the same level of confusion.' "  *McNeil-PPC, Inc. v. Merisant Co.*, Civ. No. 04-1090, 2004 WL 3316380, *21 (D. Puerto Rico 2004) (quoting Shari Seidman Diamond, Reference Guide on Survey Research, in Federal Judicial Center, Reference Manual on Scientific Evidence (2nd ed. 2000) at 258); *see also Spangler Candy Co. v. Tootsie Roll Industries, LLC*, 372 F. Supp.3d 588, 598 (N.D. Ohio 2019) (noting that "[t]here is a fine line between finding a control which is similar enough to provide accurate results as to likelihood of confusion but not too similar so as to cause confusion itself" and explaining that "[d]ue in part to the complexity and arbitrariness of control

choice, courts have been reluctant to exclude a survey based on inadequate controls alone")
(citations omitted); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp.2d 558, 595 (S.D.N.Y. 2007)
(explaining that "[a] control stimulus is used in trademark surveys to sufficiently account for
factors legally irrelevant to the requisite confusion" and that "[a] control product is one that is a
non-infringing product which is similar to the products at issue") (internal quotations omitted).

Given these constraints, "it is imperative that in an effort to control for all non-infringing
elements of a mark, a survey must not select an infringing mark."  Franklyn Decl. at ¶ 16.  That is
especially important here because the mark uses words that are common to the Scrum
framework—"Scrum" and "Master"—and "appending almost any word signifying credentialing
to those two words is very likely to create an infringing mark."  *Id.*

Professor Franklyn noted further that "[a] central feature of Defendants' infringement in
this case is based on the fact that they choose a mark that used a synonym for certified (*i.e.* licensed)
and placed it in front of Scrum Master."  *Id.* at  ¶ 17.   Thus, merely using yet another synonym
for Certified along with the words Scrum Master, would yield an infringing control.  *Id.*

Professor Franklin finds it telling that Sowers does not offer the specific control he believes
would have been proper.  *Id.*, at ¶ 18.  Instead, he merely suggests that "an appropriate control in
this matter would be a modified image of the Scrum Inc. website (test stimulus) with all references
to 'Licensed Scrum Master' changed to another name."  *Id.* at ¶ 18.  But Sowers does not suggest
another name that should have been selected.  *Id.*  And in any event, this is misguided criticism
because it risks using a control that could itself infringe on SAI's Incontestable Scrum Marks.  *Id.*
And while Sowers could have conducted primary research to verify or falsify any of his assertions,
he did not do so.  *Id.*

Further, Professor Franklin notes that to avoid using potentially infringing controls, he used companies who offer leading project management framework certification courses. *Id.* at ¶ 19. Scrum and Scrum Alliance are referred to within the body of the certification course language for one of those companies. *Id.* Because SI's website infringed in many ways, Professor Franklyn appropriately used controls that differed from SI's website. *Id.*

Defendants complain that neither of the controls used include companies with "Scrum" in their name. But Scrum is merely one of a variety of project management frameworks available to consumers in the market for this type of credentialing. *Id.* at ¶ 20. The fact that both controls are used by significant competitors to SAI, as well as SI, without using "Scrum" in their names confirms that consumers in real-world conditions might be accustomed to a variety of company names—there was no necessity for the control company's name to include Scrum. *Id.*

Finally, the significant confusion resulting from the control further demonstrates that it did not suppress confusion as a "bogus control"—"if anything, there was a surprising amount of confusion for brand names that do not include Scrum." *Id.* at ¶ 21.

### 4.    Open-ended answers were not improperly coded.

Finally, Defendants suggest that the Franklyn survey improperly coded open-ended answers. But as Professor Franklyn explains, when reviewing open-ended answers the primary goal is to ensure that there are no clear indications that respondents failed to understand the survey questions they were asked. *Id.* at ¶ 22. *See, e.g.*, *Gucci Am. Inc. v. Guess?, Inc.*, 831 F.Supp.2d 723, 741 (S.D.N.Y. 2011) ("[E]xpecting survey respondents to be able to parse through their thought processes with such a high degree of specificity in response to an open-ended 'why-do-you-say-that' question is unrealistic."). Respondents who do not understand the survey questions should be removed. *Id.* Sowers complains that respondents' open-ended answers to certain survey

questions were too vague.  The survey asked respondents (1) whether the course is put out by the same company or a different company as the course they were shown in the first section of the survey and, for those who responded the "same company" and (2) why they think the course shown is made or put out by the same company as the course shown in the first section of the survey.  *Id.* Sowers takes issue with the responses to those questions, suggesting that respondents were referring to the name of the company, rather than the credentialing courses, in their open-ended answers.  *Id.* at ¶ 23.

Respondents were asked to "Please explain in as much detail as possible what makes you think that the project management certification course shown on this page is made or put out by the same company as the project management certification course you were shown in the first section of the survey?"  *Id.* at  ¶ 24.  Sowers ignores the context of this question—comments such as "same name" and "similar names" lead to the logical conclusion that respondents are indicating the names of the courses, rather than the names of the companies.  *Id.* at ¶ 25.

Finally, Sowers cites Professor McCarthy for the proposition that "treating inconclusive responses as definite, unqualified responses in a final survey tabulations is a methodological deficiency."  *Id.* at ¶ 26.  But the Franklyn survey asked respondents a specific question about SAI's and SI's credentialing courses and whether the respondent believed they were being offered by the same company.  *Id.*  Those answering "Yes" were asked to provide their rationale, which led to the responses that Mr. Sowers cites.  *Id.*  Especially when considered in context, it is clear that answers such as "same name" and "similar names" refer to the credentialing courses.  *Id.*

### C.      Evidence of actual confusion in this litigation validates Franklyn's conclusions.

Professor Franklyn served his expert report on October 2, 2020; the survey upon which the report was based was conducted prior to that date.   Franklyn Decl. at ¶ 2.   Subsequent to the issuance of that report, ongoing discovery has produced multiple instances of actual consumer confusion in the marketplace.   *See, e.g.*, Appendix to Franklyn Decl.; *see also* Franklyn Decl. at ¶ 27.   The Fifth Circuit has explained that evidence of actual confusion is often the "best evidence" of the likelihood of confusion.   *E.g.*, *Elvis Presley Enter., Inc. v. Capece*, 141 F.3d 188, 203 (5th Cir. 1998).   The Court already recognized that this is true in this case in its Memorandum Opinion and Order granting a preliminary injunction.   Doc. 72 at 24.   The existence of such evidence, which Professor Franklyn has now reviewed, validates Professor Franklyn's findings and opinions, and it "significantly undercuts Defendants' and Sowers' arguments made in their Motion to Exclude." Franklyn Decl. ¶ 27.

### IV.
### CONCLUSION

The Court should deny Defendants' Motion to Exclude Survey Evidence and Testimony of David Franklyn.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO**
**EXCLUDE SURVEY EVIDENCE AND TESTIMONY OF DAVID FRANKLYN**          **Page 14**

27416882v.1

Respectfully submitted,

JACKSON WALKER LLP


By: */s/ Charles L. Babcock*
    Charles L. Babcock
    Texas State Bar No. 01479500
    cbabcock@jw.com
    David Folsom
    Texas State Bar No. 7210800
    dfolsom@jw.com
    Brian H. Oates
    Texas State Bar No. 24088144
    boates@jw.com
    2323 Ross Avenue, Suite 600
    Dallas, Texas 75201
    (214) 953-6000 – Phone
    (214) 953-5822 – Fax

    Joel R. Glover
    Texas State Bar No. 24087593
    jglover@jw.com
    1401 McKinney Street, Suite 1900
    Houston, Texas 77010
    (713) 752-4200 – Phone
    (713) 752-4221 – Fax

    ATTORNEYS FOR PLAINTIFF


## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2020, I caused a copy of the foregoing pleading to be served upon counsel of record for all parties vial the Court's ECF system.

    /s/ Charles L. Babcock
    Charles L. Babcock