# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | |
|---|---|
| SCRUM ALLIANCE, INC.,<br>　　Plaintiff,<br><br>　　　　　v.<br><br>SCRUM, INC.,<br>JEFF SUTHERLAND, and<br>JJ SUTHERLAND,<br><br>　　Defendants. | Civil Action No. 4:20-cv-00227 |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE SURVEY EVIDENCE AND TESTIMONY OF DAVID FRANKLYN

Defendants' motion to exclude the testimony of David Franklyn identified four fundamental errors in the design and execution of the Franklyn Survey: (i) Mr. Franklyn failed to properly screen to determine that respondents actually were potential purchasers of Scrum, Inc.'s Scrum training courses; (ii) the screening questions introduced demand effects; (iii) the control stimuli were improper; and (iv) Mr. Franklyn made obvious errors in coding open ended answers. SAI's opposition does not meaningfully rebut any of these criticisms.

**I. The Universe of The Franklyn Survey Is Far Too Broad.**

It is well established, and Mr. Franklyn does not dispute, that the survey universe should be limited to prospective purchasers of Scrum, Inc.'s offerings. *See, e.g., Domino's Pizza, Inc.*, 615 F.2d at 264 (appropriate universe consists of "those purchasers most likely to partake of the alleged infringer's goods or services."). The Franklyn Survey did not limit the universe to potential purchasers of Scrum training. To the contrary, an individual qualified for inclusion if he had taken or was "considering completing a certification course for a project management framework" even if he had never heard of Scrum. Franklyn Report at Dkt. No. 115-2 ("Franklyn Rep.") at 20; *see also* Sowers Rebuttal Report at Dkt. No. 115-3 ("Sowers Rep.") at ¶¶14, 21. Scrum, Inc. does not offer "project management training" generally, however; it offers only **Scrum** training. A consumer searching for any other project management training (such as SixSigma, or the Project Management Institute's PMP training) would not be aware of important distinctions and is not appropriately included in the survey universe. *See Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004) (excluding survey where respondents were not part of relevant customer base).

Indeed, Mr. Franklyn's screening questions were illogical and qualified respondents who could not conceivably be potential Scrum, Inc. customers. A respondent who indicated that she took a project management course in the past, is not aware of Scrum, and is not planning to take a course in the future qualified for participation in the Franklyn Survey. *See* Franklyn Rep. at 15-16, 20-21.

1

The Franklyn Survey data shows that such individuals were, in fact, included in the survey – nearly 75% of those who participated were unfamiliar with Scrum. *See* Sowers Rep. at ¶21.

Consider a simple analogy: a survey to test confusion between two companies that make only sports cars (just as SAI and Scrum, Inc. offer only Scrum training). If the Franklyn Survey approach were applied in that context, it would qualify respondents would who had purchased a car in the past and were familiar with sedans and minivans, but who had never heard of a sports car and were not likely to buy one in the future. Such a respondent would not qualify as a potential purchaser of a sports car in any meaningful sense. Here, the Franklyn Survey universe included analogous individuals – those who had taken irrelevant project management courses, had never heard of Scrum, and were not likely to take a Scrum course in the future. *See* Franklyn Rep. at 15-16, 20-21.

SAI's response ignores this fatal defect, responding instead to a straw-man argument that was never made. Mr. Sowers did not suggest that the survey universe should be limited to "corporate decision makers." His criticism, rather, was that the survey universe should include only (a) respondents who were potential customers of ***Scrum*** courses, and (b) that the respondents had at least decision-making responsibility in the choice or providers. *See* Sowers Rep. at ¶20. Unless these two qualifications were met, there is no basis to believe that the respondent would ever encounter the relevant marks in the marketplace. *See id.* And the mere fact that a participant held some type of executive level position does not mean that the individual had any decision-making responsibility for selecting ***training courses***. Mr. Franklyn speculates in his Declaration that they might, but he should have asked this question in the survey. *See* Franklyn Decl., Dkt. No. 125-1 at ¶9.

**II. The Franklyn Survey Screening Introduced Demand Effects.**

Mr. Franklyn also does not dispute that demand effects created by suggestive questions render a survey unreliable. *See, e.g.*, 6 MCCARTHY ON TRADEMARKS § 32:17. The screening questions in the Franklyn Survey created unacceptable demand effects. Question Q9 asked the

respondent about their familiarity with ten different project management frameworks (whereas, as discussed above, it should have asked the respondents if they were familiar with Scrum). *See* Franklyn Rep. at 20-21. Q10 asked the respondents whether they had taken a certification course for a project management framework, and Q11 asked whether they were considering completing a project management certification course within the next 12 months. *See* Franklyn Rep. at 19-21. This is a textbook example of a demand effect: it was obvious that an affirmative response to these questions was required to qualify for the survey. Jacoby, J., TRADEMARK SURVEYS VOLUME 1, DESIGNING, IMPLEMENTING, AND EVALUATING SURVEYS. US: AMERICAN BAR ASSOCIATION ("JACOBY") (2013), at 904 ("A demand effect results when the interviewer's questions or other elements of the survey design influence participant's responses by suggesting what the 'correct' answers might be.").

A proper screening would have masked the purpose of the survey. *See, e.g.*, JACOBY, at 666 ("it is advisable to place the yes/no screener questions of interest (e.g., Are you likely to buy a new cell phone in the next year?) in the context of a set of distractor questions (e.g., Are you likely to buy a new MP3 player in the next year?)"). There are standard ways to do this, but Mr. Franklyn did not follow them for key qualifying questions, and his results are unreliable.

**III . The Controls Used In The Franklyn Survey Did Not Isolate The Element At Issue.**

Mr. Franklyn likewise does not dispute that an improper control renders a survey unreliable. *See* SHARI DIAMOND, *Reference Guide on Survey Research*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, (3rd ed. 2011) at 399 (survey expert "should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed"). Mr. Franklyn did not isolate the element at issue (i.e., LICENSED SCRUM MASTER). The controls in the Franklyn Survey were entirely dissimilar from the Scrum, Inc. website; indeed, neither was a Scrum provider. By using "controls" that were not Scrum providers, Franklyn's survey makes the SAI and Scrum, Inc. sites stand out

relative to the others, inflating confusion, simply because they both offer Scrum training.  *See* Sowers Rep. at ¶36.

A proper control would have been a modified image of the Scrum, Inc. site with a different Scrum-related mark.  *See* Sowers Rep. at ¶34.  Mr. Franklyn insists that he could not choose another Scrum-related mark as a control for LICENSED SCRUM without choosing another infringing mark. *See* Franklyn Decl. at ¶16-17.  This is nonsense.  At the preliminary injunction stage, SAI's expert Dr. Jukam used "preferred scrum master" in his controls, and there were many other variations possible, including terms that SAI has acknowledged are not infringing, such as "Professional Scrum Master." *See* Jukam Expert Report, Dkt. No. 19-2 at 33.

Mr. Franklyn claims that his controls were proper because the survey data showed some confusion with the control.  *See* Franklyn Decl. at ¶21.  This is unpersuasive; the confusion was significantly lower than that found in the test, likely because the flaws in the control led to an artificial deflation.  *See* Sowers Rep. at ¶37.  The bottom line, moreover, is that Mr. Franklyn cannot be sure whether the confusion he reports is due to the Scrum, Inc. mark or some other element of the website, because he did not use controls that isolated the influence of the mark at issue.

**IV. The Survey Data Contradict Mr. Franklyn's Claims In His Declaration**

Mr. Franklyn denies that he mis-coded the response to open-ended questions; in fact, he put a heavy thumb on the scale.  His open-ended questions, Q207 and Q209, ask why the respondent thought the courses were "made or put out by the same company" or "sponsored or approved" by SAI.  *See* Sowers at ¶39.  As a result, it is not clear how respondents interpreted the question.

Mr. Franklyn brushes this issue aside, declaring that "it is only logical to conclude that [the respondents] were indeed referring to the names of the course, not the name of the companies." Franklyn Dec. at ¶24. The data that Mr. Franklyn present show that this assumption is unsupportable. He counted the following responses as evidence of confusion based upon the name of the course:

4

- "the name of the company is the same"
- "the institute that is offering is the same"
- "it represents the same company name"
- "they use the same business name"
- "same company"

*See* Franklyn Rep. at 31. It's obvious from these responses that at least some respondents found confusion based upon the company name, not the name of the course. Other responses make it impossible to tell whether the respondents were thinking of the course name or the company name, but Mr. Franklyn decided that they were evidence of confusion of the course name:

- "because they have the same name"
- "it has the same name"
- "similar names"
- "the name of both are very similar"
- "same name"

*Id.* By assuming that these responses supported confusion between the Scrum, Inc. and SAI marks, Mr. Franklyn improperly skewed the results of his survey.

**V. Mr. Franklyn's Declaration Includes Claims That Must Be Disregarded.**

Finally, Mr. Franklyn's Declaration includes claims that are not disclosed in his report and are irrelevant. *See* Franklyn Decl. at ¶27. First, the Franklyn Survey considered only LICENSED SCRUM MASTER; it did not include any questions, and the Franklyn Report did not disclose any opinions, regarding LICENSED SCRUM PRODUCT OWNER or LICENSED SCRUM TRAINER. *See* Sowers Rep. at ¶23. His claims about those marks are entirely speculative.

Second, Mr. Franklyn includes documents that he claims are evidence of "actual confusion." *See* Franklyn Decl. at ¶26. None of them relate to his survey, and none were disclosed in his report. They should also be disregarded.

## CONCLUSION

For the reasons set forth above and in the Defendants' motion, the Franklyn Survey is unreliable and inadmissible. It should be excluded.

5

| | |
|---|---|
| December 8, 2020 | **BROWN RUDNICK LLP** |

                                           */s/ Rebecca M. Lecaroz*
Rebecca M. Lecaroz
Edward J. Naughton (*pro hac vice*)
Jessica T. Lu  (*pro hac vice*)
Kyle P. Dorso (*pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
enaughton@brownrudnick.com
rlecaroz@brownrudnick.com
jlu@brownrudnick.com
kdorso@brownrudnick.com

-and-

Dylan P. Kletter *(pro hac vice)*
Anthony J. Boccamazzo (*pro hac vice*)
Kelsey D. Bond (*pro hac vice*)
185 Asylum Street, 38th Floor
Hartford, CT 06103
Telephone: (860) 509-6500
Facsimile: (860) 509-6501
dkletter@brownrudnick.com
aboccamazzo@brownrudnick.com
kbond@brownrudnick.com

-and-

Andrew B. Ryan
Mitchell R. Garrett
Texas State Bar No. 24054464
Texas State Bar No. 24101795
Ryan Law Partners LLP
3811 Turtle Creek Boulevard, Suite 780
Dallas, Texas 75219
Telephone: (214) 347-7360
andy@ryanlawpartners.com
mitch@ryanlawpartners.com

*Attorneys for Defendants Scrum, Inc., Jeff Sutherland, and J.J. Sutherland*

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically on December 8, 2020, pursuant to Local Rule CV-5(a) and has been served on all counsel who have consented to electronic service.

*/s/ Rebecca M. Lecaroz*
Rebecca M. Lecaroz
