UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SCRUM ALLIANCE, INC., | § | |
| | § | |
| | § | |
| PLAINTIFF, | § | CIVIL ACTION NO. 4:20-CV-227 |
| | § | |
| v. | § | |
| | § | JURY DEMANDED |
| SCRUM, INC., | § | |
| | § | |
| | § | |
| DEFENDANT. | § | |

## JOINT FINAL PRE-TRIAL ORDER

This case is set for final pre-trial conference on April 1, 2021, and in advance of the Final Pretrial Conference the Parties file this Joint Final Pretrial Order, pursuant to the Court's Scheduling Order (Dkt. 50), the Order on Defendants' Motion to Modify the Scheduling Order (Dkt. 154), and Fed. R. Civ. P. 16.

### A.    COUNSEL FOR THE PARTIES

**Counsel for Plaintiff**

David Folsom (dfolsom@jw.com)
Texas State Bar No. 07210800
**Jackson Walker L.L.P.**
6002 Summerfield, Suite B
Texarkana, Texas 75503
(903) 255-3250
(903) 255-3265 – Fax

Charles L. Babcock (cbabcock@jw.com)
Texas State Bar No. 01479500
Carl C. Butzer (cbutzer@jw.com)
Texas State Bar No. 03545900
Brian H. Oates (boates@jw.com)
Texas State Bar No. 24088144
**Jackson Walker L.L.P.**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6000 – Phone
(214) 953-5822 – Fax

Joel R. Glover (jglover@jw.com)
Texas State Bar No. 24087593
**Jackson Walker L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
(713) 752-4200 – Phone
(713) 752-4221 – Fax

**Counsel for Defendant**

Edward J. Naughton (pro hac vice)
(enaughton@brownrudnick.com )
Rebecca M. Lecaroz
(rlecaroz@brownrudnick.com)
Jessica T. Lu (pro hac vice)
(jlu@brownrudnick.com )
Kyle P. Dorso (pro hac vice)
(kdorso@brownrudnick.com)
**Brown Rudnick LLP**
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201

David M. Stein
(dstein@brownrudnick.com)
Texas State Bar No. 00797494
**Brown Rudnick LLP**
2211 Michelson Drive 7th Floor
Irvine, CA 92612
Telephone: (949) 752-7100
Facsimile: (949) 252-1514

Andrew B. Ryan
(andy@ryanlawpartners.com)
Texas State Bar No. 24054464
Mitchell R. Garrett
(mitch@ryanlawpartners.com)
Texas State Bar No. 24101795
**Ryan Law Partners LLP**
3811 Turtle Creek Boulevard, Suite 780
Dallas, Texas 75219
Telephone: (214) 347-7360

B.     **STATEMENT OF JURISDICTION**

**Plaintiff's Statement of Jurisdiction**

Jurisdiction in this case is based on 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1338 because Plaintiff brings this action under 15 U.S.C. § 1051 *et seq*., the trademark and unfair competition laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1332 because the Plaintiff and Defendants are citizens of different states and there is thus complete diversity of citizenship among the Parties and the amount in controversy exceeds $75,000. The Court has supplemental jurisdiction over the common law claims asserted pursuant to 28 U.S.C. § 1367(a).

**Defendant's Statement of Jurisdiction**

Subject matter jurisdiction is not disputed.  For purposes of this action, and subject to its pending appeal, Defendant Scrum, Inc. ("SI") does not dispute the sufficiency of its contacts with Texas for purposes of personal jurisdiction, but states that the agreements between SAI and SI establish exclusive jurisdiction over this action in the state and federal courts of Colorado.  SI also disputes that the United States District Court for the Eastern District of Texas is the appropriate venue for this action. SI's challenge to venue has not yet been resolved by this Court.

C.   **NATURE OF ACTION**

**Plaintiff's Statement Concerning the Nature of the Action**

This is a trademark infringement and unfair competition case wherein Plaintiff seeks permanent injunctive relief, damages, disgorgement of Defendant Scrum Inc.'s ("SI") profits, attorneys' fees, costs, punitive damages, and other relief related to SI's unfair conduct and infringing use of its LICENSED SCRUM MASTER, LICENSED SCRUM TRAINER, and LICENSED SCRUM PRODUCT OWNER marks (collectively, the "Infringing Marks"), and of Plaintiff's CERTIFIED SCRUMMASTER® (Reg. No. 3,738,535), CERTIFIED SCRUM TRAINER® (Reg. No. 3,510,571), and CERTIFIED SCRUM PRODUCT OWNER® (Reg. No. 3,545,767) marks (collectively, the "Incontestable Marks").

**Note:** Defendant claims to reserve the right to supplement its pleadings. Plaintiff notes that the pleadings deadline expired.

**Defendants' Statement Concerning the Nature of the Action**

This is a case about trademarks and competition.  The parties in this case each offer training and certification in Scrum, a project management framework.  The plaintiff in this case, Scrum Alliance, Inc., or "SAI," uses the marks CERTIFIED SCRUMMASTER, CERTIFIED SCRUM TRAINER and CERTIFIED SCRUM PRODUCT OWNER (the "CERTIFIED SCRUM Marks").  The defendant, SI, adopted and used its own marks, LICENSED SCRUM MASTER, LICENSED SCRUM TRAINER, and LICENSED SCRUM PRODUCT OWNER marks (together, the "LICENSED SCRUM Marks").

SAI alleges that SI's use of the LICENSED SCRUM Marks infringes SAI's rights in the CERTIFIED SCRUM Marks.

SI denies all of SAI's allegations and denies that SAI is entitled to any relief.

**Note:**  Defendant reserves the right to supplement this statement following a determination on its pending venue challenge and the assertion of its defenses and counterclaims.

D.   **CONTENTIONS OF THE PARTIES**

**Plaintiff's Statement of Its Contentions**

COUNT 1: Federal Trademark Infringement Under 15 U.S.C. § 1114 (Against SI): Plaintiff contends that SI's use of the Incontestable Marks and the Infringing Marks in interstate commerce in connection with the sale, offering for sale, distribution, and advertising of SI's services is likely to cause confusion, mistake or deception with respect to the source of the services and therefore constitutes trademark infringement. SI's conduct was willful and in bad faith. Plaintiff seeks permanent

injunctive relief, damages, disgorgement of SI's profits, attorneys' fees, costs, and other relief under 15 U.S.C. §§ 1116 and 1117.

COUNT 2: Service Mark Infringement, False Affiliation, False Advertising, and Unfair Competition under 15 U.S.C. § 1125 (Against SI): Plaintiff contends that SI's unfair conduct and its use of the Incontestable Scrum Marks and the Infringing Marks with SI's services in interstate commerce constitutes service mark infringement, false designation of origin, false or misleading representation of fact, and false or misleading description of fact which (A) is likely to cause confusion, to cause mistake, and to deceive as to the affiliation, connection or association of SI with Plaintiff and as to the origin, sponsorship, or approval of SI's services and commercial activities by Plaintiff; and (B) in commercial advertising or promotion, misrepresents the nature, characteristics or qualities of SI's services and commercial activities and/or Plaintiff's services and activities. SI's actions also have resulted in dilution of good will and misappropriation of Plaintiff's business and business value. SI's conduct was willful and in bad faith. These actions, Plaintiff contends, caused damage to Plaintiff and resulted in SI becoming unjustly enriched; and entitles Plaintiff to permanent injunctive relief, damages, disgorgement of SI's profits, attorneys' fees and costs, and other relief under 15 U.S.C. §§ 1116 and 1117.

COUNT 3: Trademark Infringement and Unfair Competition Under Texas Law (Against SI): Plaintiff contends that SI's unfair conduct and its use of the Incontestable Marks and the Infringing Marks constitutes unfair competition and infringement of Plaintiff's common law trademark rights in the Incontestable Marks, and such use was made despite knowledge of Plaintiff's exclusive rights in the Incontestable Marks, for SI's own purpose. SI's actions also have resulted in dilution of good will and misappropriation of Plaintiff's business and business value. SI's conduct was willful and in bad faith. These actions, Plaintiff contends, caused damage to Plaintiff and resulted in SI becoming unjustly enriched; and entitles Plaintiff to permanent injunctive relief, damages, disgorgement of SI's profits, attorneys' fees, costs, punitive damages, and other relief.

Plaintiff's contentions are in its pleadings, discovery responses, and expert reports, all of which are incorporated by reference.

**Defendant's Statement of its Contentions**

SI denies that it violated any of SAI's rights in the CERTIFIED SCRUM Marks. SI's use of the LICENSED SCRUM Marks and the CERTIFIED SCRUM Marks has not caused any actual confusion and is not likely to cause confusion, given the crowded field and sophisticated purchasers.  Moreover, SI selected and used the LICENSED SCRUM Marks in good faith and used the CERTIFIED SCRUM Marks in accordance with the terms of the written agreements with SAI.  In addition, SAI's claims are barred, in whole or in part, by at least the doctrines of unclean hands, estoppel, acquiescence, and waiver.

In all events, SAI has not suffered any damages as a result of SI's use of the CERTIFIED SCRUM Marks or LICENSED SCRUM Marks.

Defendant reserves the right to supplement these contentions following the assertion of its defenses and counterclaims.

**E.    STIPULATIONS AND UNCONTESTED FACTS**

1.  Plaintiff Scrum Alliance, Inc. is a Colorado nonprofit corporation with its principal place of business in Westminster, Colorado.

2.  Defendant Scrum, Inc. is a Delaware corporation with its principal place of business in Cambridge, Massachusetts.

3.  Jeff Sutherland founded and is the Chairman of Scrum, Inc.

4.  JJ Sutherland, Jeff's son, is currently the CEO of Scrum, Inc.

5.  Plaintiff is the owner of U.S. Reg. No. 3,738,535 for the mark CERTIFIED SCRUMMASTER®.

6.  Plaintiff is the owner of U.S. Reg. No. 3,510,571 for the mark CERTIFIED SCRUM TRAINER®.

7.  Plaintiff is the owner of U.S. Reg. No. 3,545,767 for the mark CERTIFIED SCRUM PRODUCT OWNER®.

8.  Jeff founded SI in 2006. (Dkt. 31-1).

9.  Jeff served as CEO of SI until December 2017. (Dkt. 31-1).

10. Jeff currently serves as Chairman of SI. (Dkt. 31-1).

11. From 2011 through 2018, JJ was Chief Product Owner of SI. (Dkt. 31-16).

12. JJ is Chief Executive Officer of SI, and he became CEO in January 2018. (Dkt. 31-16).

13. In early 2017, SI began developing certification offerings under its LICENSED SCRUM family of marks. (Dkt. 31-16).

14. In about March 2017, SI began offering training and certification under its LICENSED SCRUM MASTER, LICENSED PRODUCT OWNER, and LICENSED SCRUM TRAINER marks (the "LICENSED SCRUM Marks"). (Dkt. 31-16).

15. SI has advertised and marketed its LICENSED SCRUM offerings primarily online, via its websites, search engine advertising, and Facebook, Twitter, YouTube, and its other social media channels. (Dkt. 31-16).

16. Avi Schneier ("Schneier") has been employed by SI since February 2016. (Dkt. 31-23).

17. Joe Justice was employed at SI from September 2013 through October 2019. (Dkt. 31-16).

18. At the 2018 Global Scrum Gathering, Plaintiff and SI announced their joint venture, Scrum@Scale. (Dkt. 31-1).

## F.   CONTESTED ISSUES OF FACT AND LAW

1.   **Plaintiff's Statement of Contested Issues of Fact.**

Plaintiff does not contest the following four (4) facts, which it pulled from declarations filed by Defendants with the Court. These facts are now contested by Defendants, despite their prior filed declarations (as cited):

1. Jeff alleges he created Scrum in 1993 while he was Chief Engineer at Easel Corporation. (Dkt. 31-1).

2. Jeff gave the keynote addresses at the 2018 Minneapolis Global Scrum Gathering. (Dkt. 31-1).

3. JJ is a member of the Scrum, Inc. Japan ("SIJ") board of directors. (Dkt. 158 Ex. B).

4. During the last six months of Mr. Justice's employment with SI he was given responsibility to lead the Scrum, Inc. office in Japan. (Dkt. 31-16).

Plaintiff's Additional Statements of Contested Issues of Facts

5. Howard Sublett has been the Chief Product Owner of Plaintiff since September 1, 2018.

6. Plaintiff has issued accreditations to almost 1,000,000 practitioners worldwide.

7. Over the years, Plaintiff has spent millions of dollars for marketing agencies' work, in program and membership marketing, and for Scrum Gathering® conferences.

8. Plaintiff has for decades been the leader in the Scrum and agile community and has developed the most recognized, popular, and successful certification courses and training programs under a line of valuable trademarks.

9. Every year since 2004, Plaintiff has hosted its Scrum Gathering® conferences attended by practitioners all over the world.

10. Plaintiff's federal registrations for CERTIFIED SCRUMMASTER®, CERTIFIED SCRUM TRAINER®, and CERTIFIED SCRUM PRODUCT OWNER® are incontestable.

11. Plaintiff has continuously used its Incontestable Scrum Marks for more than a decade, including through multiple yearly Scrum Gathering® conferences attended by many practitioners from dozens of countries; and on its website and social media pages, which are accessed or "followed" by hundreds of thousands of users.

12. Plaintiff has advertised and marketed its CERTIFIED SCRUM offerings primarily online, via its website (https://www.scrumalliance.org), Facebook (https://www.facebook.com/scrumalliance), Twitter (https://twitter.com/ScrumAlliance), YouTube, and Linked In (https://www.linkedin.com/company/scrum-alliance).

13. The Incontestable Marks are closely identified with Plaintiff, and represent substantial, valuable goodwill.

14. SI is a for-profit corporation.

15. Jeff was credentialed by SAI as a Certified ScrumMaster® in January 2002; as a Certified Scrum Trainer® in October 2005; as a Certified Scrum Product Owner® in October 2007; and as a Certified Scrum Professional® in April 2018.

16. JJ was credentialed by SAI as a Certified ScrumMaster® in July 2010; as a Certified Scrum Product Owner® in October 2013; as a Certified Scrum Trainer® in April 2016; and as a Certified Scrum Professional® in April 2018.

17. JJ has been a member of the Scrum Inc. Japan board of directors since March 2019.

18. The Sutherlands have offered training for Plaintiff's credentialing courses for many years under licenses from Plaintiff. (Dkt. 72).

19. Schneier has been a member of the Scrum Inc. Japan board of directors since March 2019.

20. Schneier helped launch SIJ.

21. In January 2019, SI entered into a joint venture in Japan called Scrum Inc. Japan.

22. KDDI, Japan's second largest telecom company, is a partner with SI in SIJ.

23. The SIJ joint venture was formally announced on March 18, 2019, at a press conference attended by SI's Schneier.

24. SIJ and SI entered into a Master Service Agreement ("MSA").

25. Under the MSA, SI granted SIJ a license to provide, distribute or resell Licensed Scrum courses, licensed trademarks to SIJ.

26. In 2019, Joe Justice and Chloe O'Neil, both SI coaches, went on assignment from SI to SIJ to be embedded there and help create the operations of SIJ.

27. Between 2017 and 2020, SI provided services under its LICENSED SCRUM Marks to 3M, AB InBev, Bain, Barrick Gold, Biogen, BlackRock, Bloomberg, Blue Yonder, Boeing, Bright Horizons, Broad Institute, Campinas, Capita, Commonwealth Bank of Australia, confirmation.com, Girls Who Code, GrupoBimbo, Intel, Intelerad, IQVIA,

John Deere, m3 Management Consulting, NYAB, Toyota, Raytheon, Schlumberger, Visa, and Walmart.

28. Between sometime in 2019 and July 2020, the website www.scruminc.com displayed the following statement: "When the course is taught by Scrum Inc., the Licensed and Certified courses are identical in structure and content."

29. Between sometime in 2019 and July 2020, the website www.scruminc.com displayed the following statement: "As a Scrum Inc. trained Scrum Master you will be prepared to: … [p]ass the Certified Scrum Master (CSM) or Licensed Scrum Master (LSM) test and earn your credential."

30. Between sometime in 2019 and July 2020, the website www.scruminc.com displayed the following statement: "Our unique Certified Scrum Master and Licensed Scrum Master curriculums were developed by our founder, Dr. Jeff Sutherland."

31. Between sometime in 2019 and July 2020, the website www.licensedscrum.com displayed the following statement: "The Licensed Scrum Master credential is the only Scrum Master credential endorsed by Jeff Sutherland …"

32. SI has taught at least five courses in Texas—four in Houston and one in Dallas. (Dkt. 72).

33. At least one of SI's Texas courses was taught to Schlumberger in early 2019. (Dkt. 72).

34. There were at least two, and up to five, SI employees in charge of running the in-person classes. (Dkt. 72).

35. The Schlumberger project went on for at least a few months. (Dkt. 72).

36. For the Schlumberger project, SI's employees were on the ground in Houston three to four days a week, two to three weeks a month. (Dkt. 72).

37. During the Schlumberger project, there were also telephone conversations, emails, and texts sent between SI and Schlumberger. (Dkt. 72).

38. At the end of the Schlumberger project, SI issued Schlumberger's employees Licensed Scrum Certificates. (Dkt. 72).

39. For two days in 2019, JJ personally taught a Certified ScrumMaster course near Dallas. (Dkt. 72).

40. Jeff taught CERTIFIED SCRUMMASTER® courses in Texas in November 2016, October 2018, and February 2019. (Dkt. 72).

41. In the Spring of 2019, Jeff, Arline Sutherland, and Jessica Larsen of SI attended an Agile conference in Austin, Texas (the "2019 Austin Conference").

42. During the 2019 Austin Conference, a photo of Jeff and Dahm Hongchai (Plaintiff's Ex. 25) was taken in front of SI's Scrum@Scale booth.

43. SI trainers taught CERTIFIED SCRUMMASTER® courses in Plano, Texas in October 2016 and throughout eight different months in 2017. (Dkt. 72).

44. In 2016 and 2017, an SI contractor, Nigel Thurlow, was embedded with Toyota in Plano, Texas.

45. In 2017, SI's Avi Schneier taught a course in Irving, Texas, for New York Air Brake.

46. In August 2018, SI's Avi Schneier taught a course in Irving, Texas, for New York Air Brake.

47. SI trainers taught a CERTIFIED SCRUMMASTER® course, and in McKinney, Texas in November 2018. (Dkt. 72).

48. The CERTIFIED SCRUMMASTER®, CERTIFIED SCRUM TRAINER®, and CERTIFIED SCRUM PRODUCT OWNER® marks have obtained incontestable status pursuant to 15 U.S.C. § 1065.

49. The overall meaning, appearance, and commercial impression of the Incontestable Marks and the LICENSED SCRUM Marks are substantially the same.

50. Plaintiff and SI offer identical services under the marks at issue.

51. SI used the Incontestable Marks with the intent to cause confusion.

52. SI deliberately and willfully chose the Infringing Marks in order to confuse consumers and to trade on the goodwill and value associated with the Incontestable Scrum Marks.

53. SI on its website confusingly uses both the Incontestable Scrum Marks and the Infringing Marks in close conjunction with one another.

54. SI's conduct is a deliberate and improper attempt to harm SAI for SI's benefit.

55. SI was dishonest with Plaintiff about the creation, purpose, and development of SI's program.

56. In a call about Licensed Scrum with Howard Sublett in August 2019, JJ told Mr. Sublett, "There's not a f------ thing you can do."

57. Avi Schneier, who allegedly developed the Licensed Scrum program, wrote "F the SA."

58. Defendants chose and used the LICENSED SCRUM Marks with the intent to cause confusion with the Incontestable Marks.

59. There have been multiple instances of actual confusion between the LICENSED SCRUM Marks and the Incontestable Marks.

COUNT 1: Federal Trademark Infringement Under 15 U.S.C. § 1114 (Against SI):

60. Whether Plaintiff possesses legally protectable trademarks, namely CERTIFIED SCRUMMASTER®, CERTIFIED SCRUM TRAINER®, and CERTIFIED SCRUM PRODUCT OWNER®.

61. Whether Plaintiff owns federal registrations for each of the Incontestable Marks that are valid and enforceable.

62. Whether SI's use of Plaintiff's marks creates a likelihood of confusion as to source, affiliation, or sponsorship.

63. Whether SI's use of the LICENSED SCRUM marks creates a likelihood of confusion as to source, affiliation, or sponsorship.

64. Whether SI used in commerce any reproduction, counterfeit, copy, or colorable imitation of Plaintiff's federally registered marks in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

65. Whether SI's use of Plaintiff's federally registered marks has caused injury to Plaintiff.

66. Whether SI's use of the LICENSED SCRUM marks has caused injury to Plaintiff.

67. Whether Plaintiff suffered damages and if so, the amount that Plaintiff is entitled to recover.

68. Whether Plaintiff is entitled to recover disgorgement of SI's profits and if so, the amount that Plaintiff is entitled to recover. (Plaintiff asserts that under applicable Fifth Circuit precedent this is a question for the Court).

COUNT 2: Service Mark Infringement, False Affiliation, False Advertising, and Unfair Competition under 15 U.S.C. § 1125 (Against SI):

69. Whether Plaintiff possesses legally protectable trademarks, namely CERTIFIED SCRUMMASTER®, CERTIFIED SCRUM TRAINER®, and CERTIFIED SCRUM PRODUCT OWNER®.

70. Whether Plaintiff owns federal registrations for each of the Incontestable Marks that are valid and enforceable.

71. Whether SI's use of Plaintiff's marks creates a likelihood of confusion as to source, affiliation, or sponsorship.

72. Whether SI's use of the LICENSED SCRUM marks creates a likelihood of confusion as to source, affiliation, or sponsorship.

73. Whether SI, on or in connection with any goods or services, or any container for goods, used in commerce any word, term, name, symbol, or device, or any combination thereof, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of SI with Plaintiff.

74. Whether SI, on or in connection with any goods or services, or any container for goods, used in commerce any word, term, name, symbol, or device, or any combination thereof, which is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of SI's goods, services, or commercial activities by Plaintiff.

75. Whether SI, on or in connection with any goods or services, or any container for goods, used in commerce any word, term, name, symbol, or device, or any combination thereof, which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of SI's or Plaintiff's goods, services, or commercial activities.

76. Whether SI, on or in connection with any goods or services, or any container for goods, used in commerce any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of SI with Plaintiff.

77. Whether SI, on or in connection with any goods or services, or any container for goods, used in commerce any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of SI's goods, services, or commercial activities by Plaintiff.

78. Whether SI, on or in connection with any goods or services, or any container for goods, used in commerce any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of SI's or Plaintiff's goods, services, or commercial activities.

79. Whether SI's conduct resulted in a dilution of good will associated with Plaintiff's marks or business.

80. Whether SI misappropriated Plaintiff's business.

81. Whether SI misappropriated the value of Plaintiff's business.

82. Whether SI's use of Plaintiff's marks has caused injury to Plaintiff.

83. Whether SI's use of the LICENSED SCRUM marks has caused injury to Plaintiff.

84. Whether SI's conduct in the dilution of good will associated with Plaintiff's marks or business has caused injury to Plaintiff.

85. Whether SI's misappropriation of Plaintiff's business has caused injury to Plaintiff.

86. Whether SI misappropriation of the value of Plaintiff's business has caused injury to Plaintiff.

87. Whether Plaintiff suffered damages and if so, the amount that Plaintiff is entitled to recover.

88. Whether Plaintiff is entitled to recover disgorgement of profits and if so, the amount that Plaintiff is entitled to recover. (Plaintiff asserts that under applicable Fifth Circuit precedent this is a question for the Court).

COUNT 3:    Trademark Infringement and Unfair Competition Under Texas Law
           (Against SI):

89. Whether Plaintiff owns valid and enforceable rights in the Incontestable Marks.

90. Whether SI was on notice of Plaintiff's exclusive rights in the Incontestable Marks.

91. Whether SI advertised with Plaintiff's marks.

92. Whether SI advertised with the LICENSED SCRUM Marks.

93. Whether SI's use of Plaintiff's marks created a likelihood of confusion in the minds of potential customers as to the source, affiliation, or sponsorship of the products or services provided by SI.

94. Whether SI's use of the LICENSED SCRUM Marks created a likelihood of confusion in the minds of potential customers as to the source, affiliation, or sponsorship of the products or services provided by SI.

95. Whether SI's conduct resulted in a dilution of good will associated with Plaintiff's marks or business.

96. Whether SI misappropriated Plaintiff's business.

97. Whether SI misappropriated the value of Plaintiff's business.

98. Whether SI's use of Plaintiff's marks has caused injury to Plaintiff.

99. Whether SI's use of the LICENSED SCRUM marks has caused injury to Plaintiff.

100. Whether SI's conduct in the dilution of good will associated with Plaintiff's marks or business has caused injury to Plaintiff.

101. Whether SI's misappropriation of Plaintiff's business has caused injury to Plaintiff.

102.    Whether SI misappropriation of the value of Plaintiff's business has caused injury to Plaintiff.

103.    Whether Plaintiff suffered damages and if so, the amount that Plaintiff is entitled to recover.

104.    Whether Plaintiff is entitled to recover disgorgement of profits and if so, the amount that Plaintiff is entitled to recover.

105.    Whether SI's use of Plaintiff's marks for its own purpose is willful and in bad faith.

106.    Whether SI's use of the LICENSED SCRUM Marks was willful and in bad faith.

107.    Whether SI's conduct in the dilution of good will associated with Plaintiff's marks or business was willful and in bad faith.

108.    Whether SI's misappropriation of Plaintiff's business was willful and in bad faith.

109.    Whether SI misappropriation of the value of Plaintiff's business was willful and in bad faith.

110.    Whether Plaintiff is entitled to exemplary damages and if so, the amount that Plaintiff is entitled to recover.

2.      **<u>Plaintiff's Statement of Contested Issues of Law.</u>**

1.  Whether Massachusetts law, including without limitation Massachusetts G.L. c. 93A, is applicable in this case.

2.  Whether SI has standing or is otherwise eligible to assert to assert Massachusetts G.L. c. 93A as a defense.

<u>COUNT 1: Federal Trademark Infringement Under 15 U.S.C. § 1114 (Against SI):</u>

3.  Whether Plaintiff is entitled to permanent injunctive relief under 15 U.S.C. § 1116.

4.  Whether Plaintiff is entitled to recover actual damages and/or SI's profits under 15 U.S.C. § 1117(a).

5.  Whether, according to the circumstances of the case, Plaintiff should be awarded a sum above the amount found as actual damages, not exceeding three times such amount under 15 U.S.C. § 1117(a).

6.  Whether the amount of the recovery based on profits is inadequate and, if so, whether the Court should exercise its discretion and enter judgment for a larger sum as the Court shall find to be just, according to the circumstances of the case.

7.  Whether this is an exceptional case under 15 U.S.C. § 1117(a), for which Plaintiff is entitled to recover its attorneys' fees and, if so, the amount.

<u>COUNT 2: Service Mark Infringement, False Affiliation, False Advertising, and</u>
<u>Unfair Competition under 15 U.S.C. § 1125 (Against SI):</u>

8. Whether Plaintiff is entitled to permanent injunctive relief under 15 U.S.C. § 1116.

9. Whether Plaintiff is entitled to recover actual damages and/or SI's profits under 15 U.S.C. § 1117(a).

10. Whether, according to the circumstances of the case, Plaintiff should be awarded a sum above the amount found as actual damages, not exceeding three times such amount under 15 U.S.C. § 1117(a).

11. Whether the amount of the recovery based on profits is inadequate and, if so, whether the Court should exercise its discretion and enter judgment for a larger sum as the Court shall find to be just, according to the circumstances of the case.

12. Whether this is an exceptional case under 15 U.S.C. § 1117(a), for which Plaintiff is entitled to recover its attorneys' fees and, if so, the amount.

<u>COUNT 3:      Trademark Infringement and Unfair Competition Under Texas Law</u>
<u>(Against SI):</u>

13. Whether Plaintiff is entitled to permanent injunctive relief.

3. **<u>Defendant's Statement of Contested Issues of Fact.</u>**

<u>With respect to SAI's contested facts 1-4, SAI contends that SI is contesting certain facts found in declarations previously filed in this action.  Those purported facts were taken out of context, irrelevant, or otherwise do not accurately represent the cited declarations</u>

1. The Scrum project management framework is used around the world to develop software and other products more efficiently.

2. SAI offers training, certification, and advocacy related to the Scrum project management framework.

3. The trademarks for each of SAI's "CERTIFIED SCRUM Marks" contain the following disclaimer: "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'CERTIFIED', APART FROM THE MARK AS SHOWN."

4. Dr. Sutherland created the Scrum project management framework with Ken Schwaber in the 1990s.

5. Certain terms, such as "scrum master" and "scrum product owner" are part of the language of Scrum.

6. The terms "Scrum," "Scrum Master," "Scrum Trainer" and "Scrum Product Owner" are in the public domain and available for all to use.

7. Dr. Sutherland and JJ held the Certified Scrum Trainer certification from SAI.  Over several years, including in 2020, they entered written Certified Scrum Trainer (CST) agreements with SAI that included provisions that allowed them to use the CERTIFIED SCRUM Marks, subject to the terms and conditions of the Certified Scrum Trainer Agreement.

8. Ken Schwaber, with others, founded SAI.  Dr. Sutherland, founder of SI, was very involved in SAI from its earliest days through the filing of this lawsuit.  He was the featured keynote speaker at several of SAI's Scrum Gatherings.

9. Dr. Sutherland, together with Ken Schwaber, is the co-author of *The Scrum Guide*, which they published in 2010 and released under a Creative Commons Attribution Share-Alike License (the "CC BY-SA").  The CC BY-SA allows anyone to create derivative works from and share *The Scrum Guide*, provided that they credit Dr. Sutherland and Mr. Schwaber and release the derivative works under the CC BY-SA.

10. *The Scrum Guide* defines the Scrum framework, which includes fundamental Scrum terms "Scrum Master" and "Scrum Product Owner."

11. Following publication of *The Scrum Guide*, Dr. Sutherland and Mr. Schwaber agreed to permit SAI to use *The Scrum Guide* as the guiding curriculum for Plaintiff's training and certification services.

12. In 2014, SAI publicly announced that it was adopting *The Scrum Guide*, which it described as "the canonical definition of Scrum," and "a shared and unambiguous source of truth defined by Scrum's creators."  (Dkt. 31-1).

13. SAI's "Learning Objectives" expressly state that Plaintiff has adopted *The Scrum Guide* as the guiding curriculum for its CERTIFIED SCRUM credentials.  (Dkt. 31-1).

14. Other than the "Learning Objectives," SAI does not offer any other material or curriculum for its CERTIFIED SCRUM credentials. Each Certified Scrum Trainer creates and owns his or her training materials.

15. Each Certified Scrum Trainer is permitted to advertise his or her Certified Scrum courses on any website of their choosing.

16. Many companies and organizations offer Scrum training and credentialing under marks that include the terms "scrum master" and "scrum product owner."

17. Jeff was invited to give keynote addresses at the Global Scrum Gathering in at least 2013, 2017, and 2018. Jeff gave the keynote address at the Global Scrum Gathering in at least 2013. (Dkt. 31-1).

18. SCRUMstudy is a company offering Scrum training and credentials under the "SCRUM CERTIFIED" family of marks.

19. Scaled Agile, Inc. is a company offering Scrum training and credentials under the "CERTIFIED SAFe SCRUM" family of marks.

20. International Scrum Institute is a company offering Scrum training and credentials under the "SCRUM ACCREDITED CERTIFICATION" family of marks.

21. The Certified Scrum Trainer Credential is issued by an arm of SAI called the Trainer Approval Community ("TAC"), which is a volunteer group of Certified Scrum Trainers, each of whom runs their own training business. There are no courses or exams, the criteria applied are highly subjective.  Many in the Scrum community have criticized the TAC for its arbitrary decisions; one prominent trainer described it as "a lawsuit waiting to happen for years."

22. Since its founding, SI has provided Scrum training and consulting services to hundreds of organizations, from Fortune 100 companies to start-ups, fundamentally reshape themselves to dramatically increase productivity and drive growth. These clients engaged SI primarily to obtain consulting services, and particularly because of Dr. Sutherland's reputation as the co-creator of Scrum and his experience implementing it in dozens of companies.

23. SI also was a Registered Education Provider ("REP") for SAI.  Over several years, including in 2019, SI entered written REP agreements with SAI that included provisions which permit SI to offer Certified ScrumMaster and Certified Scrum Product Owner courses, subject to the terms and conditions of the REP Agreement.

24. The REP Agreement contains a forum selection clause and choice of law provision requiring the disputes be settled in Colorado under Colorado law.

25. As part of SI consulting engagements, clients' employees often received training, and often were offered the opportunity to take an exam in order to receive a credential to show that they had completed the training.  Prior to 2017, for those clients who requested a credential in connection with their private consulting engagement, SI taught Certified ScrumMaster or Certified Scrum Product Owner courses. SI was able to do so because Dr. Sutherland, JJ Sutherland, and a few other SI employees held the Certified Scrum Trainer credential issued by SAI.

26. SI's consulting business was quite successful, and client demand grew.  In order to meet that demand, SI needed to grow as well, and if SI were to continue to offer Certified ScrumMaster and Certified Scrum Product Owner courses, SI needed more Certified Scrum Trainers on its staff.

27. Beginning in about 2015, the TAC repeatedly refused to certify individuals that Dr. Sutherland and SI had trained and sent to SAI.

28. In 2016, SAI launched the "Enterprise License Program," which permitted the participating organization to select one non-certified Scrum practitioner to be mentored by a current Certified Scrum Trainer. As part of this program, this non-certified practitioner could teach Certified ScrumMaster and Certified Scrum Product Owner classes as if he or she was a Certified Scrum Trainer.

29. SAI selected a small number of experienced and well-respected organizations to participate in the "Enterprise License Program," including SI.

30. In February 2017, SAI cancelled the Enterprise License Program.

31. In February 2017, SAI's executive team informed JJ Sutherland that SAI would no longer issue CSTs to individuals whom Dr. Sutherland had trained. JJ Sutherland told SAI's executives that SI would need to explore other options, given the significant client demand for training and certification by SI SAI's response, in substance, was "We understand; you should do what you think best."

32. In developing its own credentialing program, SI selected the LICENSED SCRUM Marks specifically to distinguish SI's offering from the crowded field of Scrum courses and credentials offered by other organizations that used variations of the terms "Certified" or "Certification," including SAI.

33. SI did not use any of SAI's materials in developing its credentialing program or offerings for the LICENSED SCRUM credentials.

34. The LICENSED SCRUM credential offerings were based on materials authored and created by Dr. Sutherland himself, including *The Scrum Guide*.

35. Joe Justice was not involved in the development of the LICENSED SCRUM program or in the selection of the LICENSED SCRUM marks.

36. SAI was aware of SI's use of the LICENSED SCRUM Marks at least as early as October 2017 and raised no objection to SI's offerings or the marks used at that time or for several years thereafter.

37. In or about October 2017, SAI's executive team was informed in writing that SI was offering courses and certifications that competed with SAI's CERTIFIED SCRUM offerings.

38. SAI's then-CEO, Lisa Hershman, asked JJ Sutherland, SI's CEO, if SI was "offering courses that compete with CSM and CSPO, namely LSM and LSPO?" JJ Sutherland informed Ms. Hershman that SI was offering such competing courses. Ms. Hershman raised no objection. She passed along this information to other senior executives at SAI and made SAI's board aware of it.

39. SAI has long viewed SI as a "formidable competitor" in the public certification market. In early 2018, SAI's then-CEO, Lisa Hershman, told members of SAI's Board of

Directions, "[c]onsidering their name and brand strength," SI launching a competing certification program "could be a serious threat to Scrum Alliance."

40. When SI's LICENSED SCRUM program became public in August 2019, SAI raised no objection to SI's use of the LICENSED SCRUM Marks until seven months later, in March 2020, only after a separate dispute about the Scrum@Scale joint venture arose between the parties.

41. The LICENSED SCRUM courses offered by SI last multiple days and generally cost around $2,000 per individual.

42. The CERTIFIED SCRUM courses offered by SAI's trainers also last several days and are generally cheaper.

43. The LICENSED SCRUM courses cover topics and materials that are not included in the SAI Learning Objectives.

44. SI consistently used the LICENSED SCRUM marks in conjunction with its SCRUM INC. mark and its other branding.

45. There is no significant likelihood of confusion between the LICENSED SCRUM and CERTIFIED SCRUM marks, because the relevant field is crowded, the offerings require a significant investment of time and money, and consumers are sophisticated.

46. Before filing this lawsuit, SAI did not give SI any notice that SAI believed that the LICENSED SCRUM marks were infringing or that they had violated any of the terms of their agreements with SAI.

47. SI has not generated any profits as a result of the alleged infringement.

48. SAI has not lost any profits as a result of the alleged infringement.

49. SI's Certified Scrum Trainers have taught at taught at least 367 Certified Scrum courses worldwide.  Only 18 of those courses were in the Eastern District of Texas, which represents 4.9% of the total classes taught.

50. SI has taught approximately 103 private LICENSED SCRUM courses.  Four of those courses were in Texas (3 in Houston, 1 in Dallas) but none were in the Eastern District of Texas.

51. SI has taught approximately 44 public LICENSED SCRUM courses, none of which were held in Texas.

4.    **Defendant's Statement of Contested Issues of Law.**

1.  Whether venue is improper in the United States District Court for the Eastern District of Texas.

2. Whether SI's use of the LICENSED SCRUM Marks is likely to cause confusion among consumers as to affiliation, sponsorship, or source, including (i) whether the CERTIFIED SCRUM Marks are strong, (ii) whether the marks at issue are similar, (iii) whether Defendant intended to cause confusion in selecting the LICENSED SCRUM Marks, (iv) whether actual confusion has been established, and (v) the degree of care exercised by potential purchasers.

3. Whether SAI's conduct violates Massachusetts G.L. c. 93A.

4. Whether SAI's unfair or deceptive acts or practices were willful or knowing within the meaning of M.G.L. c. 93A, §§ 2 and 11.

5. Whether and to what extent SI was damaged by SAI's violation of G.L. c. 93A.

6. Whether and to what extent SAI's conduct entitles SI to an award of double or treble damages, attorneys' fees and costs.

7. Whether and to what extent SAI is entitled to any damages.

8. Whether SAI has demonstrated actual irreparable injury.

9. Whether SAI has an adequate remedy at law, such as monetary damages, to compensate for any injury.

10. Whether the balance of hardships between SI and SAI warrants a remedy in equity.

11. Whether the public interest would be disserved by a permanent injunction.

12. Whether SAI's claims are barred, in whole or in part, by the doctrines of fair use, nominative fair use and/or descriptive use.

13. Whether SAI's claims are barred, in whole or in part, on the basis that any marks at issue are functional.

14. Whether SAI's claims are barred, in whole or in part, because any infringement, if any, was innocent.

15. Whether SAI's claims are barred, in whole or in part, by applicable statutes of limitations.

16. Whether SAI's claims are barred by laches in that SAI has unreasonably delayed efforts to enforce its rights, if any, despite full awareness of SI's actions.

17. Whether SAI's claims are barred, in whole or in part, on the basis that some or all marks at issue are generic.

18. Whether SAI's claims are barred, in whole or in part, on the basis that some or all marks at issue lack distinctiveness, including, without limitation, secondary meaning.

19. Whether SAI's claims are barred by the doctrines of waiver, acquiescence, and estoppel.

20. Whether any infringement was not willful, because SI had a good faith belief that any use of the work covered by the asserted copyright was permissible.

21. Whether SAI's claims for enhanced damages and an award of fees and costs against SI have any basis in fact or law.

22. Whether SAI's claims are barred, in whole or in part, because this commencement of this action constitutes misuse of some or all of the marks at issue.

SI reserves the right to supplement its Statement of Contested Issues of Fact and Law following the assertion of its defenses and counterclaims.

## G.    LIST OF WITNESSES

•      Plaintiff's Witness List is attached as Exhibit A1.

•      Defendant's Witness List if attached as Exhibit A2.

## H.    DEPOSITION DESIGNATIONS

The parties have exchanged deposition designations and served objections and counter-designations in accordance with the Court's Scheduling Order. The parties will confer and notify the Court on any unresolved objections.

## I.    LIST OF EXHIBITS

•      Plaintiff's Exhibit List is attached as Exhibit B1.

•      Defendant's Exhibit List is attached as Exhibit B2.

## J.    LIST OF ANY PENDING MOTIONS

**Plaintiff's Pending Motions**

1. Plaintiff's Motion To Exclude Proposed Expert Testimony From Jaime d'Almeida, filed December 11, 2020. (Dkt. 134).

2. Plaintiff's Motion For An Order To Show Cause Why Defendants Should Not Be Held In Contempt And For Sanctions. (Dkt. 145).

3. Plaintiff's Motion for Sanctions. (Dkt. 151).

**Defendant's Pending Motions**

1. Defendants' Motion To Exclude Survey Evidence And Testimony Of David Franklyn, filed November 16, 2020. (Dkt. 116).

2.  Defendants' Motion To Dismiss Or, In The Alternative, To Transfer, filed October 29, 2020 (only as to SI's arguments for dismissal or transfer). (Dkt. 107).

K.    **PROBABLE LENGTH OF TRIAL**

The probable length of trial is 40 hours, 20 hours per side, excluding voir dire and instructions to the jury.

L.    **MANAGEMENT CONFERENCE LIMITATIONS**

None.

M.    **TRIAL MANAGEMENT PROCEDURES**

**Joint Trial Management Procedures**

1.  The party who intends to call a witness (whether live or by deposition) must identify that witness to opposing counsel no later than 7:00 p.m. the day before the witness is called to testify.

**Plaintiff's Proposed Additional Trial Management Procedure**

2.  A party that intends to use demonstrative evidence will provide a copy to opposing counsel before it is used at trial.

**Defendant's Proposed Additional Trial Management Procedure**

3.  A party that intends to use demonstrative evidence will provide a copy to opposing counsel no later than 6:00 pm the day before the witness is called to testify.

N.    **CERTIFICATIONS**

The undersigned counsel for each of the parties in this action does hereby certify and acknowledge the following:

1.  Full and complete disclosure has been made in accordance with the Federal Rules of Civil Procedure and the Court's orders;

2.  Discovery limitations set forth in the Federal Rules of Civil Procedure, the Local Rules, and the Court's orders have been complied with;

3.  Each exhibit in the List of Exhibits herein:

    1.    is in existence;

    2.    is numbered; and

    3.    has been disclosed and shown to opposing counsel.

**SIGNED this 1st day of April, 2021.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE